Johnnie F. TURPEN

v.

MISSOURI–KANSAS–TEXAS RAILROAD COMPANY; Brotherhood Railway Carmen of the United States and Canada.

Civ. A. No. CA 4–81–499–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

June 16, 1983.

Johns & Carson, Walter E. Carson, Washington, D.C., Jenkins & Watkins, David Watkins, Dallas, Tex., for plaintiff.

Worsham, Forsythe & Sampels, Robert A. Wooldridge, Dallas, Tex., for Missouri-Kansas-Texas R. Co.

Friedman, Weitzman, & Friedman, P.C., C. Marshall Friedman and Newton McCoy, St. Louis, Mo., Mullinax, Wells, Mauzy & Baab, Inc., L.N.D. Wells, Jr., Dallas, Tex., for Broth. Ry. of Carmen.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

Plaintiff Johnnie F. Turpen filed this suit alleging that Defendant Missouri-Kansas-Texas Railroad Company (hereinafter "M–K–T") refused to make a reasonable accommodation of his religious beliefs in violation of 42 U.S.C. § 2000e–2(a)(1) and 42 U.S.C. § 2000e(j). In addition, Plaintiff alleged that M–K–T breached the collective bargaining agreement between his employer and his union. Plaintiff further alleged that Defendant Brotherhood of Railway Carmen of the United States and Canada (hereinafter "BRC") breached its duty of fair representation in this matter in violation of 45 U.S.C. § 151, *et seq.* Plaintiff seeks damages and a declaratory judgment in this action.

Trial was to the Court without a jury. Having heard and considered all the evidence presented at trial and the arguments and briefs of the parties, the Court now enters its opinion and judgment.

### I. *Jurisdiction*

■ Defendant M–K–T asserts that this Court does not have subject matter jurisdiction over the alleged breach of the collective bargaining agreement. This Court agrees. This claim involves a "minor dispute" under the Railway Labor Act. 45 U.S.C. § 151, *et seq. See Elgin & E.R. Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945). The Railway Labor Act established the Adjustment Board with exclusive jurisdiction over "minor disputes." The Federal Courts, as courts of limited jurisdiction, have continuously observed the exclusive jurisdiction of the Adjustment Board.

The only exception to that exclusive jurisdiction is found in *Glover v. St. Louis-San Francisco Railway Co.,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969). There, the employee/plaintiff was suing *both* his *union* for breach of duty of fair representation and his railroad *employer* for breach of the collective bargaining agreement.

The mere joinder of these two claims was not sufficient to create jurisdiction in the Federal District Court. Instead, in that case, the union and the railroad employer were alleged to have been acting "in concert" to set up "schemes and contrivances" for the purpose of racial discrimination. *Glover* at 331, 89 S.Ct. at 552.

There the dispute was one "between some employees on the one hand and the union and management *together* on the other, not one 'between an employee or group of employees and a carrier or carriers.'" *Glover* at 329, 89 S.Ct. at 551 [this Court's emphasis]. The present case does not allege that the employer and union were acting *in concert* for the purpose of discrimination.

Furthermore, the Supreme Court, one year after *Glover*, discussed the distinction between two independent claims against an employer and union and a single claim in which the actions of an employer are implicated in the actions of a union. There the Supreme Court stated:

> The petitioning union defendants, however, challenge this aspect of the Court of Appeals' decision, insisting that they may not be sued alone for breach of duty when the damage to employees had its roots in their discharge by the railroad prior to the union's alleged refusal to process grievances. Apparently fearing that if sued alone they may be forced to pay damages for which the employer is wholly or partly responsible, the petitioners claim error in the Court of Appeals' affirmance of the dismissal of the suit against the railroad. These fears are groundless. The Court of Appeals permitted the railroad to be made a party to the suit if it is properly alleged that the discharge was a consequence of the union's discriminatory conduct or that the employer was in any other way implicated in the union's alleged discriminatory action. If these allegations are not made and the employer is not a party defendant, judgment against petitioners can in any event be had only for those damages that flowed from their own conduct. As-

suming a wrongful discharge by the employer independent of any discriminatory conduct by the union and a subsequent discriminatory refusal by the union to process grievances based on the discharge, damages against the union for loss of employment are unrecoverable except to the extent that its refusal to handle the grievances added to the difficulty and expense of collecting from the employer. If both the union and the employer have independently caused damage to employees, the union cannot complain if separate actions are brought against it and the employer for the portion of the total damages caused by each.

*Czosek v. O'Mara,* 397 U.S. 25, 28–29, 90 S.Ct. 770, 772–773, 25 L.Ed.2d 21 (1970).

Plaintiff asserts that this Court should follow the decision of the Tenth Circuit in *Richins v. Southern Pacific Co.,* 620 F.2d 761 (10th Cir.1980). In that case, Plaintiff's claims against his union and his employer were both held to be within the jurisdiction of the Federal District Court. However, there the Tenth Circuit noted a "pattern of collusion between the Union and Railroad." *Richins* at 762. No such pattern of collusion is alleged or suggested by the facts before the Court in the present case. Thus, the Court concludes it does not have jurisdiction over the claim against M–K–T for breach of the collective bargaining agreement.

The Court does have jurisdiction over the plaintiff's Title VII claim that Defendant M–K–T refused to make a reasonable accommodation of Plaintiff's religious beliefs. 42 U.S.C. § 2000e–5(f). No such claim of violation of Title VII has been asserted by Plaintiff against Defendant BRC and that issue is not before the Court.

Also, the Court has jurisdiction over Plaintiff's claim against Defendant BRC for breach of duty of fair representation. 45 U.S.C. § 151, *et seq.*

## II. *Factual Background*

Plaintiff Johnnie F. Turpen was employed in the railroad industry from 1951 to 1980. He worked for the Rock Island Railroad for 29 years ending in March 1980,

when the Rock Island went into receivership. During that time he performed general repairs on railway cars and equipment. Following the practices of the railroad industry, Turpen served four years until he became a "journeyman" on April 19, 1956, the date which fixed his industry seniority. He was never disciplined or discharged during his 29 years of continuous service with the Rock Island Railroad.

Plaintiff became a member of the Seventh-Day Adventist Church on June 1, 1974. A tenet of the Seventh-Day Adventist Church is to observe the Sabbath from sundown on Friday until sundown on Saturday. The keeping of the Saturday Sabbath, as a day of rest and of worship and Christian ministry is a fundamental belief in that Church as is the belief that to work during the Sabbath would violate the teachings of the Bible. The Seventh-Day Adventist Church believes in the Judeo-Christian principle that the Ten Commandments outline man's basic duty to God and his fellowman, and that the Fourth Commandment to keep the Sabbath day holy is still binding and is therefore a special sign of sanctification and allegiance to their God and Savior. For a member of the Seventh-Day Adventist Church to violate the Sabbath would jeopardize his relationship both to his God and to his Church.

In March 1980 the Rock Island went into receivership and in June 1980 the M–K–T began operating some trackage formerly operated by the Rock Island pursuant to a Labor Protective Agreement entered March 4, 1980 between various carriers and various unions. Under that March 4th agreement the M–K–T hired six former Rock Island employees as carmen at the Peach Yard in Fort Worth, with the terms and conditions of their employment governed by the collective bargaining agreement described above. Of the six former employees of Rock Island temporarily hired by M–K–T (the jobs were filled temporarily until the permanent jobs could be properly posted and bid on), Plaintiff was number four in seniority. He was given a schedule that required working on Fridays and Saturdays. He did not work on Saturday,

June 21, 1980, nor did he work on Friday, June 27, 1980, after sundown nor on Saturday, June 28, 1980. Defendant M–K–T scheduled a formal investigation of Plaintiff's not reporting to work and on July 7, 1980, Plaintiff was discharged. Defendant BRC processed the discharge claim of Plaintiff, but did not succeed in gaining reinstatement of Plaintiff.

Plaintiff filed charges of religious discrimination on July 9, 1980 and on October 29, 1980 the EEOC found reasonable cause to believe that religious discrimination had occurred. After conciliation attempts, the EEOC issued a Right to Sue Letter to Plaintiff on August 12, 1981. Plaintiff filed his original complaint in this Court on September 9, 1981.

### III. Standard of Review

#### A. Reasonable Accommodation

This Court will follow the guidelines as set forth by the Supreme Court in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), in determining whether the actions by Plaintiff's employer M–K–T, in the present case were an attempt to make "reasonable accommodations" to the religious needs of Plaintiff and whether further suggested alternatives for accommodation would have been an "undue hardship" on the employer's business. The Supreme Court agreed with the District Court in the *Hardison* case that the following actions by TWA were reasonable efforts to accommodate Hardison's religious needs:

(1) The employer held several meetings with Plaintiff in an attempt to find a solution to the problem;

(2) The employer had previously accommodated the plaintiff's observance of his special religious holidays (in return for his agreement to work on those holidays observed by others but not by his church);

(3) The employer authorized the union steward to seek days off or to search for someone who would swap shifts with Plaintiff (but no one was willing to swap shifts);

(4) The employer attempted to find Plaintiff another job;

(5) The employer had reduced its work force to a bare minimum on weekends.

*Hardison* at 77–78, 97 S.Ct. at 2273.

Those actions by TWA will be used to measure the actions by M–K–T in the present case.

## B. *Duty of Fair Representation*

Plaintiff asserts that BRC breached its duty of fair representation in this matter. BRC has responded that the duty of fair representation does not require BRC to assert alleged statutory violations of Title VII in the contractual grievance process. BRC explains that the scope of its duty is co-extensive with the scope of the union's designation as exclusive collective bargaining agent, since its duty in fact arises out of the union's status as exclusive bargaining agent. The theory underlying the duty is that because the union, as exclusive bargaining agent, has the power to bind the employees in negotiation, administration and enforcement of the agreements, it must exercise that power fairly and in the interests of those represented. *See Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (1964). Therefore, BRC asserts that only those defenses within the scope of the collective bargaining agreement are the ones that BRC must assert, and that Title VII is not a part of the collective bargaining agreement.

■ Plaintiff admits he can find no cases in which a union has been required to assert such a defense under its duty of fair representation. However, Plaintiff asserts that under the Supreme Court holding in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the union "owes a duty to assert *some* defense for its members." (Reply Brief of Plaintiff, Johnnie F. Turpen, page 6). The Court finds no duty arising by statute or by case law which would require the union to be constantly aware of all law outside of the collective bargaining agreement in order to assert all

such defenses in all of its dealings with collective bargaining agreements.

There is some strength in the argument that a union should be expected to assert those legal defenses outside of the collective bargaining agreement which do not conflict with the rights of other union members, of which it is actually aware and with which it has experience from previous union dealings in that area but the Court does not find that to be supported by case law. Assuming, without deciding the issue, that a union should assert those legal defenses outside of the collective bargaining agreement of which it is actually aware, at least to the extent that does not conflict with the rights of other union members, the Court will measure the actions of BRC by that standard.

## IV. *Duty of Accommodation*

■ In a suit alleging religious discrimination under Title VII, a plaintiff establishes a prima facie case by showing (1) he has a bona fide religious belief that conflicts with an employment requirement (2) he informed his employer of this belief, and (3) he was discharged for failure to comply with the conflicting employment requirement. *Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397 (9th Cir.1978), *cert. denied sub nom.*, *International Association of Machinists and Aerospace Workers of America v. Anderson*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Brener v. Diagnostic Center Hospital*, 671 F.2d 141 (5th Cir. 1982). Plaintiff Johnnie F. Turpen has established such a prima facie case in the present action.

■ When a prima facie case is established, the burden of production shifts to the employer to show it was unable to reasonably accommodate the plaintiff's needs without undue hardship. 42 U.S.C. § 2000e(j). The evidence before the Court reveals that when Defendant M–K–T learned of Plaintiff's objection to working from sundown Friday until sundown Saturday for religious reasons, it took several steps to try to accommodate his religious beliefs.

First, it attempted to rearrange schedules to allow four employees to have from sundown on Friday until sundown on Saturday off. Mr. Rister, an employee in charge of scheduling for Defendant M–K–T, was instructed by his superior Mr. Hacker to attempt to rearrange the schedules so that Plaintiff could have his requested day off. The Court notes that in the *Hardison* case, TWA authorized the union steward to work out scheduling changes to accommodate the plaintiff in that case. In this case, Defendant M–K–T attempted to work out its own scheduling changes to accommodate Plaintiff's religious needs rather than authorizing the union steward to do so.

Mr. Rister testified that he did attempt to rearrange schedules and was unsuccessful. Plaintiff attacks the fact that Mr. Rister spent only approximately one and one-half hours studying schedules and attempting to rearrange them. The Court, however, considers one and one-half hours to be a reasonable amount of time to spend in consideration of the six schedules of former employees of the Rock Island who were temporarily hired to work at the Peach yard, before determining that such a rescheduling would be impossible. Mr. Rister explained the need for certain numbers of employees to work on different days in relation to the amount of work that would normally be expected to be necessary on those days. This revealed that Defendant M–K–T had reduced its work force to a bare minimum on weekends, just as the *Hardison* Defendant TWA had reduced its work force in an attempt at accommodation.

Also, Defendant M–K–T, through Mr. Rister, conferred with the union representative, Henry Lamance, to determine whether a solution could be found for Plaintiff's scheduling conflict. During their conversation Mr. Rister learned that the other workers at Peach Yard, who had known and worked with Plaintiff for years, and who were aware of his desire to have rest days on his Sabbath, had complained to Mr. Lamance about being called to protect Turpen's assignment. Thus, the Court finds that Defendant M–K–T made a reasonable

assumption when it decided not to approach these same men regarding a voluntary job swap with Turpen. Such an inquiry would have been futile.

Furthermore, the conversation between Mr. Rister and Mr. Lamance revealed that the Union refused to waive the seniority provisions of the collective bargaining agreement, and thus, no involuntary swaps could have been ordered by Defendant M–K–T without violating that agreement.

It is well-settled that an employer is not required by Title VII to "carve out a special exception to its seniority system in order to help [the plaintiff] meet his religious obligations." *Hardison* 432 U.S. at 83, 97 S.Ct. at 2276.

Also, the Court notes that the subject of Plaintiff's religious holidays did not arise in this case (as they did in the *Hardison* case). Assuming that the time period during which Plaintiff was working for M–K–T did not include such religious holidays (since Plaintiff apparently did not request any such days off), the Court sees no violation of any duty owed by M–K–T to Plaintiff regarding his religious holidays. Finally, the Court finds that there is no showing Defendant M–K–T attempted to help Plaintiff find a new job, as was done in the *Hardison* case. However, the effort on the part of an employer to help the Plaintiff find another job was not presented as an *essential* element of accommodation, and this Court sees no reason to turn that factor into a mandatory requirement for an employer in every Title VII case, particularly in light of the facts of this case, in which Plaintiff had been hired on a temporary basis, and not in a permanent position.

The actions in the present case closely parallel the actions in *Hardison*, and the Court concludes, considering all the evidence as a whole, that Defendant M–K–T made reasonable efforts to accommodate Plaintiff's religious needs. Plaintiff asserts, however, that his suggestions to Defendant M–K–T, in a letter dated June 25, 1980, included his offer to pay any overtime rate that would be required to fill his

position when he was off on his Sabbath, and that such a suggestion would not have resulted in undue hardship for Defendant M–K–T. The Court disagrees. The evidence before the Court shows that the costs to require other employees to protect Plaintiff's assignment would have been far greater than the amount of the overtime differential and thus, would have been greater than the *de minimus* costs discussed in *Hardison.*

Under the collective bargaining agreement, Defendant M–K–T was under a duty to distribute the overtime equally. Records of the five remaining employees at the Peach Yard would have to be kept showing running totals of overtime each week, as well as who worked part of a shift on Friday and who worked a full shift each Saturday for Plaintiff. Also, billings to Plaintiff to pay these overtime differentials would have to be made, recorded, and dated when paid.[1] Additionally, Defendant M–K–T, if it had attempted to make such an elaborate arrangement, faced the serious problems of possibly creating a "shift change" in violation of the five day work week provisions of the collective bargaining agreement or in violation of the "Rolling or Bumping" provisions in the agreement. The above actions amount to undue hardship on the employer in this case, and are not required in a reasonable attempt to accommodate religious beliefs.[2]

V. *Duty of Fair Representation*

■ As discussed above, the Court, although not in agreement with Plaintiff's assertion, will assume *arguendo* that the defendant union, BRC, was under a duty to assert those legal defenses outside of the collective bargaining agreement of which it was actually aware, at least to the extent that did not conflict with the rights of other union members. Having made that assumption, the Court finds that Defendant BRC did not breach its duty of fair representation to Plaintiff in either the carrier's investigation or BRC's subsequent handling of the claim appealing Plaintiff's dismissal from the service of the carrier.

When BRC's General Chairman, Mr. Lamance, first learned of Plaintiff's religious beliefs and his failure to protect his assignment, he visited Fort Worth in order to investigate the matter. He first discussed it with the men at the Peach Yard. Then he went to see Mr. Rister about this matter. They discussed rearranging the schedules for Plaintiff, and Mr. Rister described his efforts and inability to make such scheduling changes. The Court notes there is no evidence before the Court that Title VII was discussed by these men, nor of the legal requirement of "reasonable accommodation" by M–K–T. Their effort was in the nature of a common-sense approach to solving a problem which a union member faced with a scheduling conflict.

When asked about a possible waiver of the seniority provisions in the collective bargaining agreement, BRC's Lamance refused such a waiver. This refusal by BRC

1. Plaintiff suggests that since M–K–T also operated the Ney Yard in Fort Worth, it possessed and regularly exercised the power to move employees from one yard to the other to fulfill work requirements and that this could be done to solve Plaintiff's schedule problem. This would, however, add further complication to the time and effort spent in bookkeeping, equalizing overtime, etc.

2. Plaintiff also raises a question regarding the actions of his employer M–K–T in not informing him when an alleged opening for a job with rest days on his Sabbath became available in December of 1980. The testimony at trial concerned the illness of a Mr. Benson in December of 1980, and the subsequent actions of Mr. Jones obtaining Benson's job, and Mr. Taylor obtaining Jones' job. All three men had more seniori-

ty than Plaintiff. The evidence also showed that the carrier never permanently filled the position which had been held by Taylor (which had rest days on Plaintiff's Sabbath). It was never advertised for bid and Defendant M–K–T permanently ceased all operations at the Peach Yard on December 31, 1981, terminating all former Rock Island employees at that time.

The Court finds the employer's actions to be reasonable regarding this job for two reasons: (1) Plaintiff had been previously discharged on July 7, 1980, and Defendant M–K–T was under no duty to inform a discharged employee of job openings; and (2) the job was never bid on and permanently filled by any employee, so Turpen could not have bid on it, even if he had not been discharged prior to the alleged opening.

appears to be both appropriate and necessary, since any waiver would have conflicted with the interests of all members of the union other than Plaintiff, whose interests Mr. Lamance was also under a duty to represent.

Also, Mr. Lamance had several conversations with Plaintiff Turpen, discussing the handling of the investigation. During the actual investigation hearing of Plaintiff by the carrier, a full record was developed, with Mr. Lamance presenting the facts surrounding Plaintiff's religious beliefs and his reasons for being absent from his assigned shift during his Sabbath. A letter from Plaintiff to M–K–T was made a part of the record, in which Plaintiff set forth all of the facts about his religious belief and in which Plaintiff also suggested various accommodations that he thought M–K–T should consider making.

Additionally, Plaintiff made a statement at the hearing, for the record, and his pastor made a statement for the record, both explaining Plaintiff's religious beliefs concerning his Sabbath. When the carrier's officer conducting the investigation asked if anyone desired to call additional witnesses, no one, including Plaintiff, responded. When asked if anyone wished to make any further statements, Plaintiff did make additional statements about the matter, saying he could not work on his Sabbath, but would work any other time he was called. Finally, the carrier's officer asked if anyone felt that the investigation had not been held in a fair and impartial manner, and there was no reply from anyone, including Plaintiff.

Plaintiff asserts that the union was under a duty at that investigation hearing to assert his legal defense of "reasonable accommodation" under Title VII. The Court

disagrees. However, assuming *arguendo* that a union should assert those legal defenses of which it is actually aware and which do not conflict with the rights of other union members, the evidence before the Court does not reveal that Mr. Lamance was aware of the "reasonable accommodation" defense. Thus, no such duty arose on the part of the union in this case.

Furthermore, even if Mr. Lamance had been aware of that legal defense and all of its legal ramifications, he, in essence, presented all of the evidence in the investigation that an assertion of that defense required.[3] Without using the words "Title VII" or "reasonable accommodation," Mr. Lamance did, in fact, show Plaintiff's religious beliefs, show Plaintiff's suggestions for changes that could be made to accommodate him, and present Plaintiff's pastor as a witness in the investigation.

After the investigation, Mr. Lamance filed a timely claim on behalf of Plaintiff requesting that he be returned to service on the ground that the discipline assessed in the case was not consistent with the discipline assessed in cases of like nature and asserting that the discipline of dismissal was arbitrary and capricious. The claim was denied and the denial was appealed to Mr. Rister who denied it, and then appealed to Mr. Hacker. Mr. Hacker likewise denied the claim, but offered to return Plaintiff to service on a leniency basis, without pay for time lost, provided certain conditions were met as set forth in his letter.

The first of the conditions set forth by Mr. Hacker involved Plaintiff protecting the position to which he was entitled by virtue of his seniority. The alternative conditions involved waivers by the union of the provisions of the collective bargaining

3. He had personal knowledge of the fact that scheduling changes had been attempted unsuccessfully. He had personal knowledge of the other employees' complaints about protecting Plaintiff's assignment. He was aware of the protective bargaining agreement seniority provisions which prevented ordering involuntary job swaps with Plaintiff and further aware that he could not waive those provisions without violat-

ing his duty to the other union members. Thus, assuming he was aware of the legal issues of "reasonable accommodation" he would have known that a reasonable accommodation had actually been attempted, and that in this case, there was no solution to the problem that would avoid "undue hardship." There was nothing else he could do.

agreement. The union had no choice but to refuse to accept the alternative conditions. When the union informed Plaintiff of Mr. Hacker's offer concerning the first condition, Plaintiff wrote to Mr. Lamance, informing him that condition was not acceptable.

Later, another conference was held between Mr. Lamance and Mr. Hacker, in a further effort to resolve the matter. At the end of that conference, the parties' positions remained unchanged. Subsequently, Mr. Lamance notified Plaintiff that the union had made the decision not to pursue his claim to statutory arbitration before the National Railroad Adjustment Board based on the conclusion that such an appeal would not have been successful.[4]

The Court finds that conclusion on the part of the union was not a breach of the duty of fair representation for several reasons. First, the United States Supreme Court, in *Alexander v. Gardner Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) discussed the relationship between contract arbitration and Title VII, saying that if the decision of the statutory arbitrator "[was] based 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on an interpretation of the collective-bargaining agreement, the arbitrator has 'exceeded the scope of the submission,' and the award will not be enforced." *Alexander* at 53, 94 S.Ct. at 1022.

In the present case, all parties agree that the collective bargaining agreement contained no provisions regarding Title VII or "reasonable accommodation" of religious beliefs. Thus, according to the Supreme Court an appeal to the statutory arbitrator, the National Railroad Adjustment Board in this case, in which an accommodation of religious beliefs would be asserted, would raise an issue beyond the scope and power of the arbitrator. The union here properly recognized the unlikelihood of success of

an appeal that lacked the support of the collective bargaining agreement.

Second, and more importantly, the Fifth Circuit in *Bures v. Houston Symphony Society*, 503 F.2d 842 (5th Cir.1974) stated that the plaintiff in a case alleging breach of duty of fair representation "must prove arbitrary or bad faith conduct (the absence of honest purpose and judgment or the presence of hostility or discrimination) by the union.... His proof of unfair representation must demonstrate 'substantial evidence of fraud, deceitful action or dishonest conduct.'" *Bures* at 844. No evidence of arbitrary or bad faith conduct on the part of the union has been presented to the Court.

Thus, the Court concludes Defendant BRC did not breach its duty of fair representation to Plaintiff Turpen in either the carrier's investigation or BRC's subsequent handling of the claim appealing Plaintiff's dismissal from the service of the carrier.

### Findings of Fact

1. Plaintiff Johnnie F. Turpen is a resident of Fort Worth, Texas.

2. Defendant Missouri-Kansas-Texas Railroad Company, herein "M–K–T", is a corporation lawfully operating in the state of Texas, with offices, operations and agent for service within the Northern District of Texas.

3. M–K–T is a common carrier by rail, conducting its transportation operations in the states of Missouri, Kansas, Texas and Oklahoma. It is engaged in interstate commerce within the meaning of the Equal Employment Opportunity Act of 1972, as amended and is an employer within the meaning of 42 U.S.C. § 2000e(b).

4. M–K–T is a carrier within the meaning of 45 U.S.C. § 151 et seq. and an employer within the meaning of the Railway Labor Act.

5. Defendant Brotherhood Railway Carmen of the United States and Canada, here-

---

**4.** Plaintiff also attacks the failure of Defendant BRC to inform him of an alleged job opening in late December 1980. As discussed above, no

such opening ever existed, and Defendant BRC owed no duty to Plaintiff in this matter. See note 2 above.

in "BRC", is an unincorporated association with offices, operations and agent for service within the Northern District of Texas.

6. BRC is a labor union and is a representative within the meaning of 45 U.S.C. § 151 Sixth.

7. The bargaining unit at M–K–T, of which Plaintiff was a part, and which was represented by BRC, had 15 or more employees at all relevant times herein.

8. Plaintiff was an employee of M–K–T within the meaning of § 701(f) of the Equal Opportunity Employment Act of 1972 as amended [42 U.S.C. § 2000e(f)].

9. The Rock Island Railroad Company at one time operated the Peach Yard in Fort Worth, Texas. Prior to March 4, 1980, the Rock Island went into receivership and terminated its operation at the Peach Yard. Plaintiff had been employed by the Rock Island Railroad continuously for 29 years until that railroad terminated operations.

10. Subsequent to the Rock Island going into receivership, many of the Nation's rail carriers, including M–K–T, took over various portions of the Rock Island's lines on an interim basis. M–K–T obtained I.C.C. authority to become such an interim carrier to operate the Rock Island trackage at Peach Yard on or about May 30, 1980.

11. Pursuant to special legislation, 45 U.S.C. § 901 *et seq.*, various carriers, including M–K–T, and various unions, including BRC, entered into a Labor Protective Agreement on March 4, 1980, covering Rock Island employees taken into the employ of interim service operators over the Rock Island lines. Pursuant to the foregoing, the collective bargaining agreement in effect between BRC and M–K–T applied to such former Rock Island employees except as otherwise provided in the foregoing legislation and agreements. The collective bargaining agreement contains no provisions requiring M–K–T to comply with state or federal anti-discrimination laws nor does it contain any provision mandating accommodation of the religious beliefs of its employees. Such requirements of M–K–T arise outside of the collective bargaining agreement.

12. M–K–T operated the Peach Yard on a 24 hour pay day, seven day per week basis.

13. When M–K–T began operations at the Peach Yard, it agreed that should it have been unable to operate the Peach Yard with its existing employees, it would give former Rock Island employees, including Plaintiff, the right of first hire based on their seniority on the Rock Island roster.

14. M–K–T hired *temporary* employees pursuant to the March 4th agreement from the old Rock Island seniority roster to immediately fill the six positions at the Peach Yard in order to expedite the commencement of operation.

15. Plaintiff was hired as a temporary employee by M–K–T on June 16, 1980 pursuant to the March 4, 1980 Labor Protective Agreement.

16. Plaintiff has never bid for a permanent job with the M–K–T.

17. At all times pertinent to this suit, Plaintiff has been a practicing member of the Seventh-Day Adventist Church. It was and is a sincerely held religious belief of Plaintiff that he should not work on the Sabbath, a period beginning at sundown on Friday, and ending at sundown on Saturday. It is a tenet of the Seventh-Day Adventist Church, and a test of fellowship, that Plaintiff refrain from working on his Sabbath.

18. There were three positions to be filled with Friday evenings and Saturdays as off days. Plaintiff was number four on the seniority roster as of June 16, 1980, and thereafter until his discharge. The three jobs which allowed Friday evening and Saturday as off days were desired, requested, bid and filled by former Rock Island employees with greater seniority than Plaintiff. Plaintiff did not have enough seniority to obtain the job he wanted.

19. Prior to commencing work as a temporary employee of M–K–T, Plaintiff told M–K–T's representative, Burt Lawson,

about his religious beliefs and practices. Lawson was in charge of hiring men for the positions at the Peach Yard. Plaintiff requested a job with off days including sundown Friday until sundown Saturday. When Plaintiff reported for work on June 16, 1980, Lawson told him that he would work the 3:00 p.m. to 11:00 p.m. trick on Tuesday through Saturday, and that Lawson had reported the schedule request to an official of the M–K–T.

20. Plaintiff worked from June 16, 1980, through Friday, June 20, 1980. On Saturday, June 21, 1980, he called in and told his superiors that he would not be available for work that day for religious reasons.

21. On Monday, June 23, 1980, Plaintiff was reprimanded by M–K–T for not protecting his trick on the previous Saturday. He informed M–K–T that he would not work from sundown on Friday until sundown on Saturday because of his religious beliefs. Plaintiff was told he had to protect his assignment.

22. On June 25, 1980, Plaintiff wrote to M–K–T, stating that he would not work Friday evenings or Saturdays. In that letter, Plaintiff offered to work another shift or to pay the difference between straight time and overtime that M–K–T would have to pay to fill Plaintiff's job on Friday evenings and Saturdays.

23. M–K–T attempted to rearrange the schedule of the employees at the Peach Yard to allow four employees to have from sundown on Friday until sundown on Saturday as off days. The schedule could not be rearranged without extensive costs, far greater than de minimus, to the M–K–T. The only proposed alternative schedule presented would have severely decreased the efficiency of M–K–T's operation at the Peach Yard and adversely affected interstate commerce. M–K–T also considered Plaintiff's suggestion that he would pay the overtime differential for other employees to work his shift. This suggestion also would have worked an undue hardship on M–K–T. There were only five other employees to begin with. M–K–T had a duty to equalize overtime. The other employees would not voluntarily protect Plaintiff's assignment. Such an arrangement would have violated the 5 day workweek provision of the collective bargaining agreement. In addition, the cost of such arrangement would have far exceeded the overtime differential. Substantial costs would be involved to keep track of and bill Plaintiff for different employees every week working part of his shift on Fridays and his shift on Saturdays.

24. BRC's General Chairman Lamance visited Fort Worth to investigate Plaintiff's situation. He talked with the men at Peach Yard. He also spoke with M–K–T employee Rister. He and Rister discussed attempts to reschedule the jobs so as to arrange a job which Plaintiff could hold with his seniority with rest days on his Sabbath. Rister advised Lamance that an attempt at such a schedule had been tried and was not possible. Lamance learned by talking with other M–K–T employees at the Peach Yard that there were no volunteers to protect Plaintiff's assignment.

25. When M–K–T inquired of BRC concerning the possibility of swaps or other accommodation, BRC told M–K–T that other employees were unwilling to protect Plaintiff's assignment. When M–K–T asked BRC whether something could be worked out to waive the seniority provisions of the labor protective agreement and the collective bargaining agreement, BRC refused to waive the provisions and responded that the contracts controlled and must be applied the same to every employee.

26. M–K–T could not accommodate Plaintiff's scheduling preferences without breaching the labor protective agreement, the collective bargaining agreement and the seniority provisions thereof, or without obtaining a waiver thereof from the BRC. The BRC refused to waive the seniority or any other provisions of the collective bargaining agreement. The costs to M–K–T of such accommodation would have been real and substantial, and greater than de minimus. To accommodate Plaintiff's

scheduling preference would have imposed an undue hardship on M–K–T.

27. M–K–T made a substantial, reasonable, good faith effort to accommodate Plaintiff's scheduling preferences.

28. M–K–T did not breach the labor protective agreement or the collective bargaining agreement.

29. Plaintiff could not obtain the job he desired because of the routine application of a bona fide seniority provision in a duty negotiated collective bargaining agreement.

30. On June 25, 1980, Plaintiff wrote to M–K–T, stating that he would not work Friday evenings or Saturdays.

31. On Friday, June 27, 1980, Plaintiff left his job early without authorization. Plaintiff did not show up for work as scheduled the next day, Saturday, June 28, 1980.

32. On July 3, 1980, pursuant to the applicable collective bargaining agreement, an investigation was held concerning Plaintiff's absence. At that hearing, in which BRC represented Plaintiff, a full record was made concerning Plaintiff's religious beliefs pertaining to his refusal to work on his Sabbath and the alternatives to Sabbath work which Plaintiff found acceptable. At the close of the hearing, the carrier's officer inquired whether any person present wished to call any other witnesses. Plaintiff remained silent. The carrier's officer inquired whether any person present wished to make a further statement concerning the subject of the investigation. Plaintiff made a short statement concerning his refusal to work on his Sabbath. When the carrier's officer again inquired if anyone wished to make a further statement, Plaintiff remained silent. The carrier's officer inquired whether anyone present felt the investigation had not been held in a fair and impartial manner. Plaintiff remained silent. At the close of the investigation, Plaintiff was suspended from active service. BRC did not in any manner refuse to allow presentation of Plaintiff's religious beliefs.

33. On July 7, 1980, after an investigation and formal hearing Plaintiff was discharged by M–K–T solely because of Plaintiff's failure to show up for work on Saturdays, June 21, 1980 and June 28, 1980, Plaintiff's absence from part of his shift on Friday, June 27, 1980, and Plaintiff's statement that his religious beliefs would prevent his working from sundown on Friday until sundown on Saturday in the future.

34. BRC appealed, on behalf of the plaintiff, Plaintiff's discharge pursuant to the collective bargaining agreement up to and including the final step at the level of M–K–T's officials; M–K–T denied the union's appeal of Plaintiff's claim. On November 14, 1980, M–K–T, without prejudice to its position, offered to return Plaintiff to work on a leniency basis provided that (1) Plaintiff protect the position obtained by virtue of his seniority, or (2) BRC waive the seniority provisions of the collective bargaining agreement, or (3) all carmen at Fort Worth agree to place Plaintiff on a job and to protect the assignment when Plaintiff was off for religious purposes at a straight time rate of pay, and the employee displaced upon Plaintiff's return to work be terminated without obligation to M–K–T. BRC properly rejected alternatives (2) and (3) of this proposal; Plaintiff through the union rejected alternative (1) his letter to BRC, rejecting alternative (1), Plaintiff thanked BRC General Chairman Lamance for his time and effort spent on Plaintiff's behalf.

35. Thereafter, in January, 1981, BRC reasonably determined that it would not process Plaintiff's appeal to the National Railroad Adjustment Board. BRC timely notified Plaintiff of this decision by certified mail, advised Plaintiff that he had the right to proceed to the Adjustment Board in his own right, advised Plaintiff of the deadline for filing within the Adjustment Board, and offered Plaintiff any technical assistance he might require.

36. Under the collective bargaining agreement, Plaintiff had the option of continuing to process his case under the contract and before the Adjustment Board.

Plaintiff's discharge was timely appealed by BRC pursuant to the terms and conditions of the collective bargaining agreement in force and effect between M–K–T and BRC. After January 1981, BRC has not processed Plaintiff's claim under the collective bargaining agreement. Plaintiff has pursued this and the matter is now pending before the Adjustment Board.

37. On or about December 31, 1981, M–K–T permanently ceased all operations at the Peach Yard in Fort Worth, Texas. All former Rock Island employees employed at M–K–T at the Peach Yard were at that time terminated from service.

38. BRC did not breach its duty of fair representation by allegedly failing to advise Plaintiff of the alleged existence of a position he could bid upon and hold with his seniority which would give him rest days on his Sabbath. No such position was ever available or posted for bid. BRC did not breach its duty by failing to advise Plaintiff of a position which did not exist.

39. Plaintiff filed charges of religious discrimination with the Equal Employment Opportunity Commission, Fort Worth, Texas, on July 9, 1980.

40. On October 9, 1980, the Fort Worth Human Relations Commission, a deferral agency under the Statute, found reasonable cause to believe that 42 U.S.C. § 2000e(j) had been violated by M–K–T for reason of M–K–T's failure to accommodate Plaintiff's religious beliefs. Plaintiff timely filed charges within 180 days of the time of the discriminatory acts claimed against M–K–T; Plaintiff filed no charges against BRC.

41. Plaintiff was issued a right to sue against M–K–T by the Equal Employment Opportunity Commission on August 12, 1981. Plaintiff filed his original Complaint in this matter against M–K–T on September 9, 1981, within ninety (90) days of the issuance of the right to sue.

42. At all times relevant herein, BRC has been agreeable to any accommodation of Plaintiff's religious practices which would not require the waiver or violation of the seniority provision of the duly negotiated collective bargaining agreement or the waiver of the contractual rights of other employees represented by BRC. BRC has not opposed strictly voluntary approaches to accommodation.

43. At the time of his dismissal from the service of M–K–T, Plaintiff did not have sufficient seniority to obtain and hold a position giving him Friday and Saturday as rest days.

44. To accommodate Plaintiff's claim of freedom to choose other work days would make it necessary to deny other workers covered by the applicable collective bargaining agreements of their rights thereunder and to forego their contractual rights to bid and set work schedules.

45. No reasonable accommodation of Plaintiff's religious practices without undue hardship is available under the circumstances of the instant case.

46. BRC properly discharged its duty of fair representation to Plaintiff.

### Conclusions of Law

1. This Court does not have subject matter jurisdiction to hear Plaintiff's claim against M–K–T for alleged breach of the collective bargaining agreement because such is a minor dispute under the Railway Labor Act. This Court does have jurisdiction over the plaintiff's claim that M–K–T refused to make a reasonable accommodation of his religious beliefs pursuant to 42 U.S.C. § 2000e–5(f) and 28 U.S.C. §§ 1331, 1343(4), and 2201. This Court has jurisdiction of Plaintiff's claim against BRC for alleged breach of duty of fair representation pursuant to 45 U.S.C. § 152 and 28 U.S.C. § 1337.

2. M–K–T did not discriminate and is not discriminating against Plaintiff's religious beliefs or practices in violation of 42 U.S.C. § 2000(j).

3. To accommodate Plaintiff's religious beliefs and practices, M–K–T would have incurred an undue hardship. The costs to the M–K–T for such accommodation would have been greater than de minimus.

4.  M–K–T would have had to and is not required to violate a bona fide seniority and other provisions of a duly negotiated collective bargaining agreement in order to accommodate Plaintiff's religious beliefs, when Plaintiff's seniority under the agreement does not permit an observance of Plaintiff's Sabbath or a reasonable accommodation.

5.  To force M–K–T to accommodate Plaintiff's religious beliefs in the instant case by requiring M–K–T to breach a duly negotiated collective bargaining agreement and to incur greater than de minimus costs and undue hardship would be a violation of the establishment clause under the First Amendment to the United States Constitution.

6.  Defendant BRC has properly discharged and fulfilled its duty of fair representation to Plaintiff.

7.  Plaintiff has failed to prove that the conduct of BRC was in bad faith or was discriminatory, arbitrary or perfunctory.

8.  BRC reasonably and in good faith exercised its proper discretion in this matter.

9.  Plaintiff has failed to adduce substantial evidence of any fraud, deceitful action or dishonest conduct on the part of BRC or its representatives.

10.  Defendant BRC is not required to propose to undertake, or accept an accommodation which would require the breach or waiver of the provisions of a duly negotiated collective bargaining agreement, including the bona fide seniority provisions thereof, or the waiver of existing contractual rights of other employees.

Judgment shall be entered accordingly.

## JUDGMENT

This action came on for trial before the Court, Honorable Eldon B. Mahon, District Judge, presiding, and the issues having been duly tried and a decision having been duly rendered,

It is ORDERED and ADJUDGED that Plaintiff take nothing, that the action be dismissed on the merits and that each party bear its own costs of action.