GLOVER ET AL. *v.* ST. LOUIS-SAN FRANCISCO
RAILWAY CO. ET AL.

No. 38. Argued November 14, 1968.—Decided January 14, 1969.

*William M. Acker, Jr.,* argued the cause and filed a brief for petitioners.

*Donald W. Fisher* argued the cause for respondents. On the brief for respondent St. Louis-San Francisco Railway Co. was *Paul R. Moody.* With *Mr. Fisher* on the brief for respondent Brotherhood of Railway Carmen of America were *Richard R. Lyman* and *Jerome A. Cooper.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The 13 petitioners here, eight Negroes and five white men, are all employees of the respondent railroad, whose duties are to repair and maintain passenger and freight cars in the railroad's yard at Birmingham, Alabama. They brought this action in the United States District Court against the railroad and the Brotherhood of Railway Carmen of America, which is the duly selected bargaining agent for carmen employees. The complaint alleged that all of the plaintiffs were qualified by experience to do the work of carmen but that all had been classified as carmen helpers for many years and had not been promoted. The complaint went on to allege the following explanation for the railroad's refusal to promote them:

> "In order to avoid calling out Negro plaintiffs to work as Carmen and to avoid promoting Negro plaintiffs to Carmen, in accordance with a tacit understanding between defendants and a subrosa agreement between the Frisco and certain officials of the Brotherhood, defendant Frisco has for a considerable period of time used so-called 'apprentices' to do the work of Carmen instead of calling out plaintiffs to do said work as required by the Collective Bargaining Agreement as properly and customarily interpreted; and the Frisco has used this means to avoid giving plaintiffs work at Carmen wage scale and permanent jobs in the classification of Carmen. This denial to plaintiffs of work as Carmen has been contrary to previous custom and practice by defendants in regard to seniority as far as 'Upgrade Carmen' are concerned. Defendant Frisco is not calling any of plaintiffs to work as Carmen in order to avoid having to promote any Negroes to Carmen."

The complaint also claimed that each plaintiff had lost in excess of $10,000 in wages as the result of being a victim of "an invidious racial discrimination," and prayed for individual damages, for an injunction to cause the defendants to cease and desist from their discrimination against petitioners and their class and "for any further, or different relief as may be meet and proper . . . ." The respondents moved to dismiss the complaint on the ground, among others, that petitioners had not exhausted the administrative remedies provided for them by the grievance machinery in the collective bargaining agreement, in the constitution of the Brotherhood, and before the National Railroad Adjustment Board. The District Court, in an unreported opinion, sustained the motion to dismiss, and the petitioners then filed the following amendment to their complaint:

> "On many occasions the Negro plaintiffs through one or more of their number, have complained both to representatives of the Brotherhood and to representatives of the Company about the foregoing discrimination and violation of the Collective Bargaining Agreement. Said Negro plaintiffs have also called upon the Brotherhood to process a grievance on their behalf with the Company under the machinery provided by the Collective Bargaining Agreement. Although a representative of the Brotherhood once indicated to the Negro plaintiffs that the Brotherhood would 'investigate the situation,' nothing concrete was ever done by the Brotherhood and no grievance was ever filed. Other representatives of the Brotherhood told the Negro plaintiffs time and time again: (a) that they were kidding themselves if they thought they could ever get white men's jobs; (b) that nothing would ever be done for them; and (c) that to file a formal complaint with the Brotherhood or with the Company would be a waste of their

time. They were told the same things by local representatives of the Company. They were treated with condescension by both Brotherhood and Company, sometimes laughed at and sometimes 'cussed,' but never taken seriously. When the white plaintiffs brought their plight to the attention of the Brotherhood, they got substantially the same treatment which the Negro plaintiffs received, except that they were called 'nigger lovers' and were told that they were just inviting trouble. Both defendants attempted to intimidate plaintiffs, Negro and white. Plaintiffs have been completely frustrated in their efforts to present their grievance either to the Brotherhood or to the Company. In addition, to employ the purported internal complaint machinery within the Brotherhood itself would only add to plaintiffs' frustration and, if ever possible to pursue it to a final conclusion it would take years. To process a grievance with the Company without the cooperation of the Brotherhood would be a useless formality. To take the grievance before the National Railroad Adjustment Board (a tribunal composed of paid representatives from the Companies and the Brotherhoods) would consume an average time of five years, and would be completely futile under the instant circumstances where the Company and the Brotherhood are working 'hand-in-glove.' All of these purported administrative remedies are wholly inadequate, and to require their complete exhaustion would simply add to plaintiffs' expense and frustration, would exhaust plaintiffs, and would amount to a denial of 'due process of law,' prohibited by the Constitution of the United States."

The District Court again sustained the motion to dismiss. The Court of Appeals affirmed the dismissal, agreeing

with the opinion of the District Court and adding several authorities to those cited by the District Court, 386 F. 2d 452 (C. A. 5th Cir. 1967), and we granted certiorari, 390 U. S. 1023 (1968). We think that none of the authorities cited in either opinion justify the dismissal and reverse and remand the case for trial in the District Court.

It is true, as the respondents here contend, that this Court has held that the Railroad Adjustment Board has exclusive jurisdiction, under § 3 First (i) of the Railway Labor Act, set out below,[1] to interpret the meaning of the terms of a collective bargaining agreement.[2] We have held, however, that § 3 First (i) by its own terms applies only to "disputes between an employee or group of employees and a carrier or carriers." *Conley* v. *Gibson*, 355 U. S. 41, 44 (1957). In *Conley*, as in the present case, the suit was one brought by the employees against their own union, claiming breach of the duty of fair representation, and we held that the jurisdiction of the federal courts was clear. In the present case, of course, the petitioners sought relief not only against their union but also against the railroad, and it might at one time have been thought that the jurisdiction of the Railroad Adjust-

---

[1] In full, § 3 First (i) reads:

"The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on the date of approval of this Act [June 21, 1934], shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." 48 Stat. 1191, 45 U. S. C. § 153 First (i).

[2] See, *e. g., Slocum* v. *Delaware, L. & W. R. Co.,* 339 U. S. 239.

ment Board remains exclusive in a fair representation case, to the extent that relief is sought against the railroad for alleged discriminatory performance of an agreement validly entered into and lawful in its terms. See, e. g., *Hayes* v. *Union Pacific R. Co.*, 184 F. 2d 337 (C. A. 9th Cir. 1950), cert. denied, 340 U. S. 942 (1951). This view, however, was squarely rejected in the *Conley* case, where we said, "[F]or the reasons set forth in the text we believe [*Hayes, supra*] was decided incorrectly." 355 U. S., at 44, n. 4. In this situation no meaningful distinction can be drawn between discriminatory action in negotiating the terms of an agreement and discriminatory enforcement of terms that are fair on their face. Moreover, although the employer is made a party to insure complete and meaningful relief, it still remains true that in essence the "dispute" is one between some employees on the one hand and the union and management together on the other, not one "between an employee or group of employees and a carrier or carriers." Finally, the Railroad Adjustment Board has no power to order the kind of relief necessary even with respect to the railroad alone, in order to end entirely abuses of the sort alleged here. The federal courts may therefore properly exercise jurisdiction over both the union and the railroad. See also *Steele* v. *Louisville & Nashville R. Co.*, 323 U. S. 192 (1944).

The respondents also argue that the complaint should be dismissed because of the petitioners' failure to exhaust their remedies under the collective bargaining agreement, the union constitution, and the Railway Labor Act. They rely particularly on *Republic Steel Corp.* v. *Maddox*, 379 U. S. 650 (1965), and *Vaca* v. *Sipes*, 386 U. S. 171 (1967). The Court has made clear, however, that the exhaustion requirement is subject to a number of exceptions for the variety of situations in which doctrinaire application of the exhaustion rule would defeat

the overall purposes of federal labor relations policy. Thus, in *Vaca* itself the Court stressed:

"[I]t is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement. *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650. However, because these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant. The problem then is to determine under what circumstances the individual employee may obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures." 386 U. S., at 184–185.

The Court in *Vaca* went on to specify at least two situations in which suit could be brought by the employee despite his failure to exhaust fully his contractual remedies. The circumstances of the present case call into play another of the most obvious exceptions to the exhaustion requirement—the situation where the effort to proceed formally with contractual or administrative remedies would be wholly futile. In a line of cases beginning with *Steele* v. *Louisville & Nashville R. Co., supra,* the Court has rejected the contention that employees alleging racial discrimination should be required to submit their controversy to "a group which is in large part chosen by the [defendants] against whom their real complaint is made." 323 U. S., at 206. And the reasons which prompted the Court to hold as it did about the inadequacy of a remedy before the Adjustment Board apply with equal force to any remedy administered by the union, by the company, or both, to pass on claims by the very employees whose rights they have been charged

with neglecting and betraying. Here the complaint alleges in the clearest possible terms that a formal effort to pursue contractual or administrative remedies would be absolutely futile. Under these circumstances, the *attempt* to exhaust contractual remedies, required under *Maddox,* is easily satisfied by petitioners' repeated complaints to company and union officials, and no time-consuming formalities should be demanded of them. The allegations are that the bargaining representatives of the car employees have been acting in concert with the railroad employer to set up schemes and contrivances to bar Negroes from promotion wholly because of race. If that is true, insistence that petitioners exhaust the remedies administered by the union and the railroad would only serve to prolong the deprivation of rights to which these petitioners according to their allegations are justly and legally entitled.

The judgment is reversed and the case is remanded for trial.

*Reversed and remanded.*

MR. JUSTICE HARLAN, concurring.

I join in the Court's opinion with one addition and one reservation.

I believe that *Richardson* v. *Texas & N. O. R. Co.,* 242 F. 2d 230 (1957), decided by the Fifth Circuit some years before its decision in the present case, also supports today's holding that the federal courts may grant railroad employees ancillary relief against an employer who aids and abets their union in breaching its duty of fair representation. A contrary result would bifurcate, and needlessly proliferate, litigation.

I think it clear that footnote 4 of *Conley* v. *Gibson,* 355 U. S. 41, 44 (1957), did not—as some of the language in today's opinion, *ante,* at 328–329, might otherwise imply—address itself to the question now decided, which

is one of first impression in this Court. *Conley* was a suit against the union *only*. A careful reading of *Hayes* v. *Union Pacific R. Co.*, 184 F. 2d 337 (1950); the District Court's opinion in *Conley*, 138 F. Supp. 60 (1955), which relied on *Hayes;* and this Court's opinion in *Conley* makes it readily apparent that our disapproval of *Hayes* had nothing to do with the question of jurisdiction over an employer in a fair representation action.