LOCAL UNION NO. 1075, UNITED RUB-
BER, CORK, LINOLEUM AND PLAS-
TIC WORKERS OF AMERICA, AFL–
CIO, Appellee,

v.

UNITED RUBBER, CORK, LINOLEUM
AND PLASTIC WORKERS OF AMERI-
CA, AFL–CIO, Appellee,

and

Local Union No. 285, United Rubber,
Cork, Linoleum and Plastic Workers
of America, AFL–CIO, Appellant.

No. 82–1745.

United States Court of Appeals,
Third Circuit.

Argued July 12, 1983.

Decided Sept. 1, 1983.

As Amended Sept. 20, 1983.

G. Sander Davis (argued), Cornelius C. O'Brien, Jr., of counsel, O'Brien & Davis, Philadelphia, Pa., for appellant.

Charles R. Armstrong (argued), URW Gen. Counsel, Paul H. Malesick, II, URW Asst. Gen. Counsel, Akron, Ohio, for appellee United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO.

Jerome H. Gerber, James L. Cowden (argued), Handler & Gerber, P.C., Harrisburg, Pa., for appellant Local Union No. 1075.

Before SEITZ, Chief Judge, and SLOVITER and VAN DUSEN, Circuit Judges.

**OPINION OF THE COURT**

SLOVITER, Circuit Judge.

## I.

### Introduction

This action was filed by Local Union No. 1075 of the United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO (Local 1075), against its parent union, the United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO (International), and another local of the same union, Local Union No. 285 (Local 285), alleging that Local 285 "wrongfully failed to allocate an equitable share of its assets to Local 1075" and that the International "wrongfully failed to take any action to compel [such] allocation." Following a bench trial, the district court determined that Local 1075 was entitled to an equitable allocation of the assets in the amount of $35,273.58. The court determined that Local 285 was solely responsible for plaintiff's injury, and therefore also entered judgment in favor of the defendant International.

Local 285 appeals. Both Local 1075 and the International have filed briefs as appellees, although their position differs in some respects. At issue is the jurisdiction of the district court under § 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), Local 1075's alleged failure to exhaust internal union remedies, and Local 1075's substantive right to recovery. We will affirm the judgment of the district court.

## II.

### Facts

Immediately before the events at issue, Local 285 represented workers at two plants in the Lancaster, Pennsylvania area: one owned by Armstrong Cork Co. which produced linoleum and other flooring materials, and the other owned by Kerr Glass Co. (to whom it had been sold by Armstrong in 1969) which produced bottle closing devices. The Kerr workers were substantially outnumbered by the Armstrong workers. In 1978, several Kerr workers formed a separate charter committee and requested the International to constitute the Kerr workers as a separate local, on the ground that they were not being adequately represented by Local 285. On July 31, 1979, the International Executive Board approved holding an election to determine the wishes of the Kerr employees. By letter dated August 13, 1979, the International notified Local 285 of the Board's action, and added:

> The Board further stipulated that if the URW members employed at Kerr Glass vote in favor of a separate charter, then the membership of Local 285 shall take action to allocate the funds of the Local Union in an equitable manner before any separate charter is issued.

Local 285 protested this action of the International but was informed that its protest was both "premature" and "untimely." At the election held on December 13, 1979, the Kerr employees voted in favor of a separate charter. In January 1980, the Local 285 membership, purporting to follow the International's directive of August 13, 1979, voted that the Kerr employees should not receive any of the assets of Local 285. The International was notified of this deci-

**184**

sion by letter dated January 21, 1980. On April 29, 1980, the International's Executive Board voted to issue a separate charter to the Kerr employees without reaching the question of allocation of assets. On July 1, 1980, the charter was issued, and the Kerr employees were constituted as Local 1075. That local did not then receive, nor has it since received, any allocation of the assets of Local 285.

## III.

### *Jurisdiction*

■ Appellant has challenged the existence of subject matter jurisdiction. The complaint asserts, and the district court found, that jurisdiction lies under § 301 of the LMRA, 29 U.S.C. § 185. Section 301(a) provides that "[s]uits for violation of contracts between an employer and a labor organization . . . , or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties." Since Local 1075 does not allege any violation of a collective bargaining agreement or any other employer/union contract, jurisdiction in this case depends on characterizing it as a suit "for violation of [a] contract . . . between . . . labor organizations."

In *United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry v. Local 334 (Plumbing & Pipefitting)*, 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981), the Court held that § 301 provided federal jurisdiction for a suit filed by a local against its international alleging that the international had violated its constitution by ordering the consolidation and reorganization of a number of New Jersey locals, including the plaintiff local. The Court held that union constitutions are "contracts" for purposes of § 301 jurisdiction. *Id.* at 619–22, 101 S.Ct. at 2548–50. Therefore, "a suit brought by a local union against its parent international union, alleging a violation of the international's constitution, falls within § 301(a) jurisdiction of the federal district courts." *Id.* at 616, 627, 101 S.Ct. at 2547, 2553.

The complaint in this case alleged that since November 1, 1978 the relationship between Local 285, Local 1075, their members, and the International was governed by the 1978 International Constitution which "empowers the International to divide the membership of an existing local union by issuing a separate charter to a group of members of the existing local union"; that "[t]he International's decision to direct a referendum upon certain stipulations, and to thereafter create a separate local union for Kerr Glass employees, was within the International's authority under the 1978 Constitution"; and that "Local 285's refusal to allocate an equitable portion of its assets to the new local union violated its duty under the 1978 Constitution". We must determine jurisdiction on the basis of the well-pleaded allegations of the complaint. On that basis, the complaint alleges violations of the International's Constitution and hence falls within § 301(a) jurisdiction under the precedent of the *Plumbing & Pipefitting* decision.

## IV.

### *Exhaustion*

Both defendants Local 285 and the International claim that plaintiff failed to exhaust its available remedies under the union's Constitution, and that its complaint should be barred. Article IV, section 3(d) of the International's Constitution provides:

The International President shall decide all questions of law, disputes or questions in controversy however arising, except such cases as follow the procedure and conditions outlined in Article IX, all his decisions being subject to appeal, first to the International Executive Board and then to the Convention. However, no question of law or other dispute or question in controversy shall be referred to the International President by any individual member of a Local Union for decision until after such question has been decided by the Local Union Executive Board and the membership of the Local Union.

Any question of law or other dispute or question in controversy referred to the International President must be referred within forty-five (45) days after action taken by the membership of the Local Union. Notice in writing of appeal of any decisions of the International President must be filed with the International Secretary-Treasurer and International President within thirty (30) days from date of decision.

The district court rejected the exhaustion claim stating, "it is not at all clear as to whether that section of the Constitution does provide for resolution of an internal dispute" and that "the International Union already decided the issue by imposing the requirement on Local Union 285 to make the equitable allocation" so that "further review before the International would not be necessary."

The defendants' exhaustion contention must be evaluated in light of the approach which the Supreme Court has signalled in considering exhaustion claims under § 301. Unlike exhaustion with regard to claims under certain titles of the Labor-Management Reporting and Disclosure Act of 1959, which Congress has statutorily imposed, *see, e.g.,* 29 U.S.C. § 411(a)(4) (Title I) and 29 U.S.C. § 482(a)(1) (Title IV), the requirement of exhaustion of § 301 claims has been judicially imposed. In *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965), the Court stated that an employee alleging a violation of a collective-bargaining agreement between his union and employer must attempt to exhaust exclusive contractual grievance and arbitration procedures before bringing suit under § 301(a). In *Vaca v. Sipes,* 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967), the Court recognized that such contractual remedies, which were devised and often controlled by the union and the employer, may prove unsatisfactory or unworkable for the individual grievant, and reaffirmed the statement in *Republic Steel* that there are situations where the failure to exhaust will be excused.

The issue in those cases involved exhaustion by employees of collective bargaining grievance procedures before bringing suit. In *Clayton v. UAW,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981), the Court considered whether the same policies underlie exhaustion of internal union procedures before an employee can bring suit against the union for breach of its duty of fair representation. The Court explained. "The rule established by *Republic Steel* was ... intended to protect the integrity of the collective-bargaining process and to further that aspect of national labor policy that encourages private rather than judicial resolution of disputes arising over the interpretation and application of collective-bargaining agreements." *Id.* at 686–87, 101 S.Ct. at 2093–94.

In considering the rationale for requiring exhaustion of internal union procedures, the Court reasoned that a similar policy is implicated. It focused "on that aspect of national labor policy that encourages private rather than judicial resolution of disputes arising over collective-bargaining agreements," and emphasized that "a requirement that aggrieved employees exhaust internal remedies might lead to nonjudicial resolution of some contractual grievances." *Id.* at 689, 101 S.Ct. at 2095. However, the Court expressly "decline[d] to impose a universal exhaustion requirement lest employees with meritorious § 301 claims be forced to exhaust themselves and their resources by submitting their claims to potentially lengthy internal union procedures that may not be adequate to redress their underlying grievances." *Id.* The Court reiterated its holdings in the earlier cases that "courts have discretion to decide whether to require exhaustion of internal union procedures." The court continued:

In exercising this discretion, *at least* three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he

seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust.

*Id.* at 689, 101 S.Ct. at 2095 (emphasis added).

It is evident that unlike the rigid approach which many lower federal courts have followed in § 301 cases, the Supreme Court has taken a much more flexible view. *See* Note, *Exhaustion of Intraunion Remedies Doctrine: The Lower Federal Courts' Application of Clayton v. UAW,* 8 J.Corp.L. 389 (1983). The Court has repeatedly looked to the "reasonable[ness]" of a particular procedure, *see, e.g., NLRB v. Industrial Union of Marine & Shipbuilding Workers (Marine Workers),* 391 U.S. 418, 428, 88 S.Ct. 1717, 1723, 20 L.Ed.2d 706 (1968), and reversed lower court decisions which had imposed what the Court considered an undue exhaustion requirement.[1]

Since the exhaustion issue usually arises in suits by an employee against an employer to overturn an unfavorable employment decision and against the union alleging violation of the duty of fair representation, none of the Supreme Court cases discussing exhaustion considered the applicability of that doctrine to a local union suing another local and/or the international.[2] However, in *Local 334 v. United Ass'n of Journeymen,* 669 F.2d 129, 131 n. 2 (3d Cir.1982), on

remand from the Supreme Court's *Plumbing & Pipefitting* decision, we interpreted the *Clayton* opinion as reaffirming "the vitality of the exhaustion doctrine in cases of internal union disputes such as this one [a suit by a local union against its parent arising from the International's order requiring consolidation of certain local unions]." Although *Clayton* involved a suit by a union member against the employer and union alleging a § 301 violation, rather than an intraunion dispute as there, the rationale given in *Clayton* for exhaustion is equally pertinent to intraunion disputes. As the courts grapple with our ever-increasing caseload, we must continue to search for alternative means of dispute resolution. When there is an internal union procedure that offers a viable nonjudicial mechanism for resolving disputes between locals and/or their parent, sound prudential considerations suggest its use should be encouraged. Nonetheless, the courts must retain the same discretion in applying exhaustion in such instances as the Supreme Court has emphasized they must exercise when an individual union member seeks to sue under § 301.

■ We reject the defendants' argument that discretion whether to require exhaustion is limited to consideration of the three factors referred to in *Clayton, i.e.* hostility, inadequacy of remedy, and delay of judicial hearing. The *Clayton* Court expressly stated, "In exercising this discretion, *at least* three factors should be relevant." 451 U.S. at 689, 101 S.Ct. at 2095 (emphasis added).

1. *See Clayton v. UAW,* 451 U.S. 679, 685, 101 S.Ct. 2088, 2093, 68 L.Ed.2d 538 (1981) ("where an internal union appeals procedure cannot result in reactivation of the employee's grievance or an award of the complete relief sought in his § 301 suit, exhaustion *will not* be required"); *Glover v. St. Louis-San Francisco Ry. Co.,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969) (no exhaustion was required when the contractual remedies would be futile because employees were complaining that the union acted with the employer in establishing schemes to bar blacks from promotions wholly because of race); *NLRB v. Marine Workers,* 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968) (no exhaustion was required by an employee expelled for bringing an unfair labor charge against the union to the *NLRB*). *See also Vaca v. Sipes,*

386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967) (stating that exhaustion of contractual remedies would not be required where the employee "can prove that the union as bargaining agent breached its duty of fair representation in *its* handling of the employee's grievance.")

2. In *Plumbing & Pipefitting,* 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981), the district court had dismissed, in part, on the ground of a local union's failure to exhaust internal procedures as to its claim *against the International.* The Supreme Court's opinion was based exclusively on another issue, that of subject matter jurisdiction, and it did not discuss exhaustion.

Instead, whether exhaustion was required must depend upon the reasonableness of imposing it under the circumstances.

One of the factors to be considered in that inquiry is whether there was a constitutional provision which clearly and unambiguously directed resort to an established internal mechanism. An example of such a provision is that quoted by the Supreme Court in *Marine Workers,* where the constitution provided:

> Every member ... considering himself ... aggrieved by any action of this Union, the [General Executive Board], a National Officer, a Local or other subdivision of this Union shall exhaust all remedies and appeals within the Union, provided by this Constitution, before he shall resort to any court or other tribunal outside of the Union.

391 U.S. at 420–21, 88 S.Ct. at 1719–20. Similarly, the UAW constitutional provision considered in *Clayton* required every union member "who feels aggrieved by any action, decision, or penalty imposed upon him" by the union to exhaust internal union appeals procedures before seeking redress from a "civil court or governmental agency." *See* 451 U.S. at 682–83, 101 S.Ct. at 2091–92.

■ In contrast, the provision of the International Constitution at issue in this case contains no language similar to that in *Marine Workers* and *Clayton* referring to the need to use this procedure before filing suit. It fails to contain any language which *requires* grievants, including locals, to bring disputes to the International President. Instead it merely imposes an obligation on the President to decide the issues which are brought to him ("The International President shall decide all questions of law, disputes or questions in controversy however arising. . . .") The only other relevant sentence, that containing the time requirement, also does not unambiguously provide that the grievants *must* refer all such questions to the President. Instead it merely states: "Any question of law or other dispute or question in controversy *referred to* the International President must be re-

ferred within forty-five (45) days after action taken by the membership of the Local Union." (emphasis added). Thus, it seems to suggest that any question which the grievant chooses to refer to the President must be referred in 45 days.

Although the provision in the International's Constitution establishes an internal appeals procedure which can be resorted to by a grievant, it falls far short of mandating use of the procedure before suit can be brought. Since Local 1075's witnesses testified that they were never told of the requirement to exhaust, that fact and the absence of a provision which would have put grievants on notice that exhaustion was mandated are relevant to the reasonableness of their failure to do so.

One of the reasons given by the district court for its decision to excuse exhaustion was that "Local 1075 enjoyed the benefits of a directive from the International president and the International Union's Executive Board, and it had no reason to appeal from this favorable directive." Certainly, a *sine qua non* of an exhaustion requirement is the existence of some definitive adverse action from which the internal appeal must be taken. It is difficult to find such an action in this case.

The only action which the International suggests triggered the exhaustion requirement is the January 1980 decision of Local 285 not to allocate any assets to Local 1075. However, as the district court concluded, Local 1075 could have reasonably assumed that the International would follow through on its directive ordering allocation, and, relying on that directive, could have thought an appeal unnecessary. We must view the exhaustion requirement from the contemporaneous viewpoint of the grievant rather than with the benefit of hindsight. We see no reason for Local 1075 to have foreseen that the International would change its position.

Furthermore, it is unreasonable to expect that there should have been any appeal by the separate charter committee, even were it to have had standing, within 45 days after Local 285 voted not to allocate any

assets because the International had not then decided to grant the Kerr employees a separate charter. Until that decision, there was no assurance that there would be an entity to which to allocate the assets. As the International wrote to Local 285 on December 18, 1979 when it attempted to appeal, "The appeal is premature since no decision to issue a separate charter has been made."

Unlike the International, Local 285 suggests that, in addition to the Local's January 1980 action, exhaustion should also have been triggered either by the vote of the International Executive Board on April 29, 1980 to award a charter finding all preconditions were met and the letter of May 12, 1980 from the Executive Board informing the separate charter committee of this decision or the issuance of the charter to Local 1075 on July 1, 1980 without resolution of the allocation matter. Local 1075 concedes that it learned in the summer of 1980 that the Executive Board would not keep its promise as to the allocation of assets. Brief of Appellee Local 1075 at 12. However, it is difficult to use any action by the Executive Board as the triggering action.

It is at best ambiguous whether the internal appeals procedure contemplates appeal from such decision. The constitutional provision mentions only referral to the International President "after action taken by the membership of the Local Union." It is also unclear what internal remedies would have been available to appeal decisions of the International Executive Board. Since the Executive Board is a higher authority than the International President, it does not appear practical to require appeal of its decision to the President, which is the first step in the appeals process provided under the Constitution. *See Johnson v. General Motors,* 641 F.2d 1075, 1078–83 (2d Cir.1981)

(internal union remedies may be so ambiguous as to excuse exhaustion).

Although the Constitution does also provide that decisions of the Executive Board are appealable to the Convention, the Convention apparently was not scheduled to be held until the fall of 1981. Exhaustion of intraunion remedies is generally not required for more than a four-month period, the period which the courts have borrowed from § 101(a)(4) of the LMRDA.[3] *See Kinney v. International Brotherhood of Electrical Workers,* 669 F.2d 1222, 1230 (9th Cir. 1981). Since the Convention would not have taken place until 1½ years after the action of the Executive Board, exhaustion would not be required if an appeal to the Convention was the only route open to Local 1075.[4] In *Local 334 v. United Ass'n. of Journeymen,* 669 F.2d at 131 n. 2, we stated that exhaustion of intraunion remedies was not required because, *inter alia,* the Convention, which appeared to be the only avenue of appeal, was not scheduled to occur for several years.

We return therefore to the discretion lodged in the courts to excuse exhaustion of internal union remedies in appropriate circumstances when it is reasonable to do so. In light of the absence of a clear provision mandating resort to internal union appeal procedures before instituting court action, and in view of the difficulty of determining precisely which decision should have been appealed, the district court was within the bounds of its discretion in concluding exhaustion was not required.

## V.

### *Merits*

■ We find Local 285's challenge to the district court's decision on the merits unpersuasive. The International's Constitution specifically empowers the International to

---

**3.** That section provides that before instituting suit union members "may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time)." 29 U.S.C. § 411(a)(4).

**4.** In its brief, Local 285 suggests that an Appeals Committee exists which can hear appeals

from actions of the Executive Board independent of the Convention. However, there is no reference to appeal to such committee in the Constitution, and the district court made no finding with regard to its jurisdiction. Accordingly, we cannot base an exhaustion requirement on the existence of such a committee.

create new unions out of existing local unions. Article VII, section 1(a) provides, in part:

> Local Union Charters may be issued in various areas covering employees of more than one (1) employer upon recommendation of the District Director and upon approval by the International President. Such Charters may be issued for the purpose of admitting to membership employees subject to the jurisdiction of the United Rubber, Cork, Linoleum and Plastic Workers of America whose interests would best be served by membership in such Local Union. *Nothing herein contained shall preclude the issuance of a separate Charter to a group of employees who are members of such Local Union if it is determined by the International President to be in the best interests of all concerned.*

(emphasis added).

The additional power in the International to order the allocation of local union assets can be found in various provisions of the Constitution. The district court found such power in Article IV, section 3(d), previously quoted, which vests authority in the International President to "decide all ... disputes ... however arising", in what the district court termed "the broadest phraseology." The International also relies on Article IV, section 1(c) which provides:

> To the United Rubber, Cork, Linoleum and Plastic Workers of America *[the International] is reserved the right to finally determine and adjust all matters of general importance to the welfare of any Local Union* or any member thereof, while to each Local Union is conceded the right to make all necessary laws for local government which do not conflict with the laws and policies of the International Union.

(emphasis added). Either provision constitutes a grant of power to the International to adjudicate a division of assets between locals. As we noted in *Local 334 v. United Ass'n of Journeymen,* 669 F.2d at 131, a union's interpretation of its own constitution will ordinarily be accepted unless it is unfair or unreasonable.

Local 285 argues that Local 1075 was not entitled to an allocation because under Pennsylvania law members of an unincorporated association who voluntarily withdraw are not entitled to claim any share in the assets in the absence of a written contract. However, it is federal substantive law, not Pennsylvania law, which is applicable. *See Plumbing & Pipefitting,* 452 U.S. at 627, 101 S.Ct. at 2553. It is also erroneous to view the formation of a new local as analogous to the voluntary withdrawal of members. Instead, the new Local 1075 was formed by the International pursuant to explicit constitutional authority.

The district court found that Local 1075 relied to its detriment on the communications from the International directing that Local 285 "shall" take action to allocate the funds of the Local Union in an equitable manner (letter of August 13, 1979 from the Secretary-Treasurer of the International, and letter of September 27, 1979 from the International President). This factual finding is not clearly erroneous.[5]

Although the Constitution authorized the International to adjudicate a division of assets between the two locals, it failed to exercise that authority notwithstanding ample opportunity to do so. As late as March 1981, when the attorney for Local 1075 mailed what the district court viewed as an attempt at exhaustion and was rebuffed by the International on the ground of untimeliness, the International could have exercised its authority. Accordingly, it was incumbent on the district court to discharge the allocation function once it

---

**5.** Local 285 suggests that if the International induced some action on the part of Local 1075, then Local 285 should have been given the opportunity to file a cross-claim against the International to gain redress. However, it never attempted to file such a cross-claim in a

timely fashion. Instead, on October 12, 1982, months after the entry of judgment on June 2, 1982, it filed a motion to file an amended answer and cross-claim. The district court acted well within its discretion in denying that motion as untimely.

decided that Local 1075 had a right to such allocation.

The predicate for any allocation of assets between formerly joined groups is, of course, recognition that the assets came into existence as a result of the joint effort and/or contribution of all of the membership. The district court's allocation of 32% of the assets to Local 1075 was based on the proportionate membership of the two locals, which had remained constant between the two groups for a substantial period. Local 285 introduced no evidence to support any different allocation.

For the foregoing reasons, we will affirm the judgment of the district court.