**KERR–McGEE CHEMICAL
CORPORATION,
Plaintiff,**

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO, CLC, LOCAL NO. 15258, Defendant.**

**Civ. A. No. EC 90–241–D–O.**

United States District Court,
N.D. Mississippi, E.D.

Aug. 10, 1992.

Carolyn Gregg Hill, Oklahoma City, Okl., Kenneth E. Milam, Watkins & Eager, Jackson, Miss., for plaintiff.

Roger K. Doolittle, Jackson, Miss., Samuel H. Heldman, Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

Plaintiff, Kerr–McGee Chemical Corporation, seeks to vacate an award by an arbitrator of a dispute arising out of a collective bargaining agreement. The defendant, the United Steelworkers of America, AFL–CIO ("the union"), has counterclaimed for breach of the collective bargaining agreement.[1] This matter is before the court on cross-motions for summary judgment. Because the court finds that the award was based on an interpretation of the collective bargaining agreement which drew its "essence" from that agreement, summary judgment will be granted in favor of the union and Kerr–McGee will be enjoined from refusing to comply with the arbitrator's award. However, the court declines to award the union costs, attorney's fees and other alleged damages, having found that the employer's challenge to the award was justified.

### Factual Background

Kerr–McGee's Forest Products Division maintains a plant in Columbus, Mississippi. A collective bargaining agreement between the Forest Products Division and the union contains a section on "Management Prerogatives." The section states:

3.1 Management prerogatives and the exercise thereof shall be unqualified, shall remain exclusively in the management, and shall include without limitation all matters not covered by this Agreement as well as the following, except to the extent that the following are limited or modified by the terms and conditions of this Agreement.

(a) The right to hire, lay off, promote, demote, transfer, assign to shifts, adjust

---

1. As will be noted below, the court finds that the union's counterclaim is more appropriately considered as a suit to enforce the arbitration award.

work force, maintain discipline and efficiency, and discharge and discipline all employees for just cause ...

Another section on "Safety and Health" includes a provision on periodic drug testing. This section states:

12.8 In order to maintain a safe work environment all employees shall be subject to periodic drug testing without advance notice. Refusal to submit to such a test shall be just cause for discharge. Should an employee test positive for one or more illegal drugs or controlled substance[s], he shall be subject to immediate discharge.

Finally, an article containing the "Grievance and Arbitration Procedure" sets forth the procedure for dispute resolution. Section 14.4 of that article provides for the jurisdiction of the arbitrator and states that "[t]he decision of the arbitrator shall be final and binding upon all parties." The section also provides that:

A. The arbitrator may consider only the particular issue or issues presented to him, and his decision must be based solely on the interpretation of the provisions of this Agreement.

B. The arbitrator shall be prohibited from adding to, modifying, or subtracting from the terms of this Agreement.

C. Practices Existing under this Agreement may be considered by the arbitrator only where the language of this Agreement is so ambiguous that the intentions of the parties as to its meaning and application can be ascertained in no other manner.

The dispute which is the subject of this suit arose when Kerr–McGee arranged for drug testing of its employees on October 9, 1989 by Emergicare facility workers at the Kerr–McGee plant. Those Kerr–McGee employees not available on the 9th were tested the following day at the Emergicare facility itself. Employees Kevin Wells and Gerond Sanders were in the group tested on the 9th at the plant. Employee Robert Robinson was out ill on the 9th and thus was tested the next day at the Emergicare facility. These three employees tested positive for drug use and were discharged by Kerr–McGee immediately thereafter. All three elected to pursue their claims through arbitration.[2]

The two-part question presented to Arbitrator Arthur Eliot Berkeley was whether the company had "just cause to discharge Robert Robinson, Gerond Sanders and Kevin Wells" and "if not, what shall the remedy be?" The factual findings of the arbitrator are not in dispute. Arbitrator Berkeley found that the drug test was accurate and reliable and that all three subjects either smoked marijuana or were in the immediate vicinity of those who had done so.[3] The company offered the grievants no opportunity to explain the circumstances and did not offer to further investigate the matters beyond the positive test results. In other words, the positive test results were deemed sufficient by the company to constitute immediate just cause for discharge.

In interpreting the collective bargaining agreement, Berkeley confined his Opinion and Award to Section 12.8 and the difference between the language in that section pertaining to an employee's refusal to take a drug test versus the language pertaining to a positive result. Berkeley determined that by stating that the "refusal to submit" to a drug test "shall be just cause for discharge," the drafters of the agreement intended a meaning different from the second part of the same paragraph which states that where an employee has tested positive, he or she "shall be *subject to* immediate discharge." (emphasis added). Looking to the bargaining history of 12.8,

---

2. According to the arbitrator, three other employees tested positive for drug use, but did not elect to pursue their claims through arbitration. One additional employee also tested positive, but was taking a prescribed pain killer which was verified by a doctor. This employee was allowed to return to work.

3. Employee Sanders told the arbitrator that he did not smoke marijuana himself but that he was in close proximity to those who had and that his positive test results came from passive inhalation. Whether the test administered to Sanders accurately reflected his own use of drugs does not bear on the court's opinion here, so that the court does not further consider it.

Berkeley found that when the agreement was negotiated, the union was highly concerned about drug testing becoming a harassment tool and that management consequently assured the union it would follow "due process" in using test results. Given this history and the language differences in the two parts of the paragraph on drug testing, Berkeley concluded that the agreement contemplates immediate termination for employees unwilling to subject themselves to the test and due process for those who submit to the test but who test positive.[4] Accordingly, the company "overstepped its rights when it took disciplinary action" solely on the basis of the drug test and should have 1) given each employee an opportunity to explain; 2) analyzed the employee's work and safety history; 3) considered prior incidents of impairment; and 4) explored the employee's interest in a substance abuse rehabilitation program.[5] Regarding a remedy, Berkeley ruled that each grievant was entitled to reinstatement, back pay and benefits.

■ Plaintiff asserts that Berkeley's award must be vacated because he completely ignored the "just cause" provision contained in the "Management Prerogatives" section of 3.1 and because he went outside the contract to create additional procedures for investigation and due process not contemplated by the discretionary provisions afforded to the employer. The union, on the other hand, contends that this award did draw its "essence" and meaning from the collective bargaining agreement, so that even if the court would interpret the agreement differently, the arbitrator's award must be respected.

### Discussion
#### 1. The Award

■ By agreeing to arbitrate, parties to a collective bargaining contract have bargained to have an arbitrator "determine [the] facts and interpret the contract." *Manville Forest Products Corp. v. United Paperworkers International Local 364,* 831 F.2d 72, 74 (5th Cir.1987). Holding the parties to this bargain creates no injustice; as long as the arbitrator draws his interpretation from the "essence" of the contract, finality in arbitration furthers the peaceful settlement of disputes and helps stem strikes and violence. *Id.; see also United Paperworkers International Union v. Misco,* 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987). Consequently, judicial review of arbitration awards is exceedingly narrow. "The arbitrator may not ignore the plain language of the contract," but because the parties have authorized the arbitrator to "give meaning to the language," a court "should not reject an award on the ground that the arbitrator misread the contract." *Id.* at 38, 108 S.Ct. at 371.

> [I]t must be remembered that grievance and arbitration procedures are part and parcel of the ongoing process of collective bargaining. It is through these processes that the supplementary rules of the plant are established. [Thus,] ... the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and *cannot simply reflect the arbitrator's own notions of industrial justice.* But as long as the arbitrator is *even arguably construing or applying the contract and acting within the scope of his authority,* that a court is convinced that he committed serious error does not suffice to overturn his decision.

*Id.* (citations omitted and emphasis added).

Without doubt, Arbitrator Berkeley liberally read this bargaining contract. From the phrase "subject to immediate dis-

---

**4.** Among the other considerations used by Berkeley in determining that a positive test entitles examinees to certain due process were 1) Kerr McGee's willingness to give one employee an opportunity to show that his positive test was caused by prescription drugs; 2) the lack of any evidence to suggest that the off-premises behavior of the three grievants contributed to a lack of safety inside the work environment; and 3) Kerr–McGee's drug screen authorization form which stated that a positive test "may be cause for termination," but which did not state that the employee shall be terminated.

**5.** Opinion and Award of Arbitrator, pp. 14–15.

charge," Berkeley saw an obligation in the employer to investigate the drug use, to find a relationship between the use and workplace safety and to explore rehabilitation options. However, because the court cannot determine the correctness of the arbitrator's decision, the limited issue here is whether Berkeley dispensed his own version of industrial justice or arguably construed and applied the contract. Several Fifth Circuit cases offer guidance. In *Dixie Machine Welding & Metal Works, Inc. v. International Brotherhood of Boilermakers*, 867 F.2d 250, 252 (5th Cir.1989), the Court of Appeals reversed a district court finding that the arbitrator's judgment contradicted the clear and unambiguous language of a new bargaining provision on overtime pay rates and benefit contributions. The court noted that it was the arbitrator's prerogative to determine the significance of language differences between the old and new contracts. *Id.* at 253. Likewise, in *United Food & Commercial Workers v. National Tea Company*, 899 F.2d 386 (5th Cir.1990), *International Union of Electrical, Radio & Machine Workers v. Ingram Manufacturing Co.*, 715 F.2d 886 (5th Cir.1983), *cert. denied*, 466 U.S. 928, 104 S.Ct. 1711, 80 L.Ed.2d 184 (1984), and *Boise Cascade Corp. v. United Steelworkers of America Local 7001*, 588 F.2d 127 (5th Cir.1979), *cert. denied*, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979), the Fifth Circuit declined to disturb the reasoning of arbitrators who looked to sentence structure, bargaining history and extrinsic evidence to parse the meaning of an agreement. Even the presence of a "no modification" clause, similar to the one used in this agreement, does not

prevent an arbitrator from looking to past practices and negotiating history. *Manville Forest Products*, 831 F.2d at 76. Thus, where the agreement states that the arbitrator shall have no power to "add to, subtract from, alter, amend or disregard any provision of this Agreement," the arbitrator may draw upon outside practices to fill a gap in the written contract. *Id.*

Kerr–McGee advances several good arguments, but none convince the court that Berkeley failed to consider the essence of this agreement. For example, did Berkeley ignore the plain language of the agreement by not referring to the "just cause" provision in Section 3.1? As noted, Berkeley confined his discussion of the collective bargaining agreement to Section 12.8 of the agreement, which contains the provision for drug testing, and did not mention Section 3.1, which gives the employer the right to discharge and discipline for just cause. Although Berkeley does not mention Section 3.1, a review of the arbitrator's opinion, particularly the portion titled "Question Presented," shows that the issue of "just cause" was considered and heavily argued by the parties. It seems fair to conclude that the employer's right to fire for just cause under 3.1 was well understood and that the issue presented was whether a positive drug test constituted such just cause.[6]

Kerr–McGee next argues that even if the arbitrator was cognizant of 3.1, that section is preempted or modified by Section 12.8 on drug testing. If 12.8 does modify 3.1, it remained the arbitrator's prerogative to determine its effect. Berkeley specifi-

---

**6.** Even if this court were to determine that the arbitrator erred by not specifically mentioning 3.1, the court would overstep its authority if it assumed that the absence of such a discussion translates into an intent to ignore the plain reading of the contract. Instead, the proper course would be for this court to remand the entire case back to the arbitrator for a specific determination of 3.1 in conjunction with section 12.8. *See Misco*, 484 U.S. at 41–42, 108 S.Ct. at 372–373 (reviewing court should not simply abandon the arbitrator's decision, but should remand case to arbitrator for a definite construction of relevant provision); *Teamsters Local 657 v. Stanley Structures*, 735 F.2d 903, 904

(5th Cir.1984) (noting that when case first came before the district court, district court had to remand for more express decision by arbitration committee on applicability of certain notice requirements).

Although Kerr–McGee did not request that the instant case be remanded, the undersigned has considered this option and concludes that a remand is unnecessary. The entire opinion of the arbitrator focuses on whether the employer had "just cause" to terminate. Asking the arbitrator to go back and take special note of the just cause provision would be asking the arbitrator to restate the obvious.

cally considered Section 12.8 and found that the section created two different paths—one for employees who refuse a test outright and one for employees who agree to take a test but receive a positive result. His determination that the second path creates certain due process rights is not an implausible result, especially since the two parts of the paragraph are not identical. Consequently, the determination must stand. In the same vein, Kerr–McGee argues that 12.8 plainly and unambiguously states that a positive test will "subject" the employee to "immediate discharge." But Berkeley discussed this language at length and determined that it did not mean that discharge was automatic.

This is not to say that an arbitrator invariably shields himself from court review by simply mentioning a provision and ignoring its plain meaning. This argument is belied by the fact that awards *are* occasionally vacated, although the cases that have done so are distinguishable. For example, in *HMC Management Corp. v. Carpenters District Council of New Orleans*, 750 F.2d 1302, 1304 (5th Cir.1985), an arbitrator's determination that an employer acted improperly in firing one inefficient employee but retaining the other was deemed to be the arbitrator's own brand of industrial justice when the collective bargaining agreement stated that just and reasonable cause for discharge was "inefficiency." In the instant case, however, the arbitrator had more to consider than this one-word statement; looking to an entire paragraph on drug testing, Berkeley discerned two separate parts in the paragraph and found reason to distinguish them.[7]

Nor is the language in this collective bargaining agreement as straightforward as that found in *International Brotherhood of Fireman Local 935–B v. Nestle Co.*, 630 F.2d 474 (6th Cir.1980), or *Georgia Pacific Corp. v Local 27, United Paperworkers Int'l*, 864 F.2d 940 (1st Cir.1988), two cases from other circuits which vacated the arbitrator's result. In *Nestle*, vacation of the award was appropriate because the collective bargaining agreement expressly provided that insubordination "shall constitute cause for ... dismissal," leaving no room for contract interpretation. Similarly, the First Circuit Court of Appeals saw no room for interpretation in *Georgia–Pacific* where the bargaining contract stated that any employee could be discharged for just cause and listed the conduct at issue as one of the causes.[8]

---

**7.** A Fifth Circuit case not cited by either party because of its recency is *E.I. DuPont DeNemours Co. v. Local 900, International Chemical Workers Union*, 968 F.2d 456 (5th Cir.1992) (per curiam). The court discusses this case because its facts are highly similar to the instant case with one important difference. In *DuPont*, a supervisor detected the odor of marijuana in the vicinity of two workers on DuPont property. The employees voluntarily submitted to a drug test which proved positive and the employees were immediately discharged. The employees filed grievances under a collective bargaining agreement which, like that in the instant case, prohibited the discharge of employees except for just cause. As in this case, an arbitrator was asked to determine a two-part question: "Were the grievants discharged for just cause under the contract" and "[I]f not, what is the appropriate remedy?" In deciding these questions, the arbitrator implicitly determined that DuPont had just cause to fire and then went on to state that while discharge was an available punishment, it was inappropriate. Accordingly, the arbitrator ordered reinstatement, rehabilitative treatment and follow-up testing. The district court vacated the award and the Fifth Circuit affirmed.

The court is certain that had Kerr–McGee been aware of the *DuPont* case, it would have cited it to bolster their arguments. However, the important difference between *DuPont* and the instant case is this: In *DuPont*, it was well understood that using drugs on company premises was a discharge offense. Even the arbitrator agreed that cause existed for discharge. It was thus inappropriate for the arbitrator, after finding such cause, to move to the second part of the two-part question and fashion a remedy. By contrast, the question Berkeley considered in the instant case was whether Kerr–McGee could immediately fire someone upon the basis of a positive test alone. Given the bargaining history of these parties and ambiguities in the agreement, it was not well understood that a positive test created such immediate just cause. Thus, arbitrator Berkeley did not overstep his authority when, after determining that Kerr–McGee violated the agreement, he fashioned an appropriate remedy.

**8.** *Nestle* and *Georgia–Pacific* were distinguished a few years later in *Dixie Warehouse & Cartage Co. v. General Drivers Local 89*, 898 F.2d 507, 511 (6th Cir.1990), and *Crafts Precision Industries, Inc. v. Lodge No. 1836 of District 38, Inter-*

Kerr–McGee contends that the wording of the instant contract is equally clear. Here, however, the pivotal clause was not a one-line statement contained within a list of prohibited conduct but instead was a paragraph of several lines existing separately from the management section on discharge and discipline. The juxtaposition and length of this paragraph created ambiguities which had to be dissected by the arbitrator. While the undersigned confesses that he probably would have reached a different result given the same contract language,[9] Berkeley's decision drew its essence from the contract nonetheless.

As for the remedy—reinstatement of the three employees plus back pay—the court again finds no reason to disturb the arbitrator's result. The two-part question posed to Arbitrator Berkeley required him to determine a remedy upon finding that just cause was absent. "[W]here it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." *Misco,* 484 U.S. at 38, 108 S.Ct. at 371. For all of these reasons, the opinion and award of the arbitrator shall be enforced.

2. Attorney's Fees and Other Damages

In its counterclaim, the union seeks costs and reasonable attorney's fees for the defense of this action. When a challenge to an arbitrator's decision is without justification, such costs may be awarded. *International Association of Machinists & Aerospace Workers, District 776 v. Texas Steel Co.,* 538 F.2d 1116, 1121 (5th Cir.1976), *cert. denied,* 429 U.S. 1095, 97 S.Ct. 1110, 51 L.Ed.2d 542 (1977); *see also National Tea,* 899 F.2d at 389. In this case, Kerr–McGee's challenge was not so unfounded so as to justify the award of attorney's fees and costs. Accordingly, the court declines to award the union such fees and costs expended in enforcing the arbitrator's award.

Finally, the union seeks "incidental damages" on behalf of the three discharged employees and "other and further relief" that the court deems just. The union bases its claim for incidental damages on a claim for "breach of the collective bargaining agreement."[10] Without further authority, the union contends that Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, justifies such an award. Ordinarily, an aggrieved party who seeks a court remedy for breach of a collective bargaining agreement is only allowed to do so if the union has breached its duty of fair representation, if the employer has repudiated the bargaining procedure,[11] or if use of the grievance procedure would be futile due to the lack of an impartial decisionmaker.[12] None of these circumstances are present here. Indeed, the union has strenuously argued that the arbitrator's remedy of reinstatement and back pay be respected. In the opinion of the court, the union's attempt to secure additional damages over and above the arbitrator's remedy is no more justified than Kerr–McGee's attempt to revisit the arbitrator's interpretation of the contract. Just as the parties bargained to have an arbitrator determine the contract language, they bargained to have the arbitrator determine the remedy. This may be why a union ordinarily sues for *enforcement* of the arbitrator's award, *see National Tea,* 899 F.2d at 388; *Stanley Structures,* 735 F.2d at 904; *Texas Steel,* 538 F.2d at 1117–1118, and why a suit for damages for breach ordinarily cannot be brought in a federal district court in the first instance where the bargaining agreement contem-

---

national Assoc. of Machinists and Aerospace Workers, 889 F.2d 1184, 1186 (1st Cir.1989), respectively.

9. Like the court in *Dixie Warehouse & Cartage,* 898 F.2d at 511, this court is compelled by precedent to conclude that the arbitrator did not exceed his authority even while finding the result unfortunate.

10. *See* Answer and Counterclaim, pp. 4–5.

11. *Vaca v. Sipes,* 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

12. *Glover v. St. Louis–San Francisco Railway Co.,* 393 U.S. 324, 330, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969).

plates the grievance procedure as the exclusive remedy.

Unfortunately, neither party has addressed this issue in their briefs and the parties' vague pleadings offer little guidance. In upholding Arbitrator Berkeley's award, the court has construed the union's counterclaim as a request for enforcement of the contract and has granted summary judgment in favor of the union on this part of the counterclaim. But the court cannot grant the union's request for damages for breach of contract when the union has not shown its entitlement to such damages as a matter of law. Nor is the court inclined to undertake the expense of a trial on the damages question when the federal policy favoring arbitration suggests the arbitrator's remedy should be respected.

Accordingly, judgment will be entered for the union and Kerr–McGee will be enjoined from refusing to comply with Berkeley's award. This means that all three discharged employees are entitled to reinstatement, full benefits and back pay from the date of discharge, less any earnings and unemployment compensation.[13] However, the union will not be entitled to recover other incidental damages on behalf of the three discharged employees. In the event the union knows of *specific* statutory or case law upholding the award of such damages even after the arbitrator has determined a remedy, the union may bring this matter to the attention of the court by proper means. In the meantime, this case will be fully and finally dismissed.

A separate order and final judgment in accordance with this memorandum opinion will be entered this day.

---

**13.** *See* Opinion and Award of Arbitrator, p. 19.