**Roger INCE, Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION and Local 102, Brotherhood of Railroad Signalmen, Defendants.**

No. 85 Civ. 4883 (CBM).

United States District Court,
S.D. New York.

Aug. 2, 1988.

Bergner & Bergner by Arthur Liberstein, New York City, for plaintiff.

Siff, Newman, Rosen & Parker, P.C. by Mark S. Landman, New York City, for defendant Nat. R.R. Passenger Corp.

Shapiro, Shiff, Beilly, Rosenberg & Fox by Sidney Fox, Gerald Richman, New York

City, for defendant Local 102, Broth. of R.R. Signalmen.

## OPINION

MOTLEY, District Judge.

Plaintiff Rodger (spelled in all captions as "Roger") Ince ("Ince") brings suit against the above-captioned defendants under the Railway Labor Act, 49 U.S.C. §§ 151–163, 181–188 (1982), claiming wrongful discharge by the railroad ("Amtrak"), violation of the duty of fair representation by the union ("Local 102"), and conspiracy by both defendants. Both defendants move for summary judgment.

## FACTS

Ince was hired by Amtrak as a trackman on June 16, 1983. His employment in this position was governed by a collective bargaining agreement between Amtrak and the Brotherhood of Maintenance of Way Employees ("BMWE"). That agreement contained, as authorized by 45 U.S.C. § 152 Eleventh (a) (1982), a "union shop" clause under which all employees are required to become members of the labor organization representing them within 60 days of their employment.[1] Ince apparently had some difficulty in obtaining application forms from BMWE. He states that he did not receive them until he asked about them, in October or November 1983. Deposition of Roger Ince ("Ince Dep."), October 24, 1985, at 18. He did not sign the checkoff form that provided for automatic payroll deductions of his BMWE dues until January 5, 1984.[2] Id. at 20; Notice of Motion by Defendant National Railroad Passenger Corporation ("Amtrak Summary Judgment

Motion"), Exhibit 6. Ince was aware of his obligation to pay his BMWE dues under the union shop provisions of the collective bargaining agreement, Ince Dep. at 17, and expressed his concern about and desire for compliance with all necessary arrangements. Id. at 21.

On March 9, 1984, Ince was furloughed by Amtrak from his position as a trackman. Id.; Affidavit of W.H. Robinson, Jr. ("Robinson Aff."), ¶ 2. On April 5, 1984, he was rehired by Amtrak as a signalman trainee. Robinson Aff. ¶ 3. The exclusive collective bargaining agent for Amtrak signalmen is the Brotherhood of Railway Signalmen ("BRS"). Id.; Ince Dep. at 22. BRS's collective bargaining agreement with Amtrak, like BMWE's, contained a union shop clause, so that Ince was now required to join BRS within 60 calendar days of April 5.[3] Ince was aware of this obligation and concerned to fulfill it. Ince Dep. at 22–23, 30.

Ince appears to have had even greater difficulty in dealing with BRS than he had with BMWE. Ince Dep. at 23–39. Only on October 15, 1984 was he able to meet with Gerald Jones, Financial Secretary of Local 102, to complete the necessary application forms and to tender a check for $200 in payment of his membership fee and accrued dues. Id. at 39–40; Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary Judgment ("Ince Aff.") ¶ 3; see id. Exh. A (photocopy of check). Ince claims that he also signed a checkoff form for his BRS dues at this time. Ince Dep. at 42–43; Ince Aff. ¶ 3. Amtrak, however, denies ever having received any such au-

---

**1.** 45 U.S.C. § 152 Eleventh provides, in pertinent part:

> [A]ny carrier ... and a labor organization ... duly designated and authorized to represent employees ... shall be permitted—
> (a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment ... all employees shall become members of the labor organization representing their craft or class.

**2.** Such checkoff forms are authorized by 45 U.S.C. § 152 Eleventh (b) (1982).

**3.** The relevant portion of the union shop clause of the collective bargaining agreement between BRS and Amtrak provides:

> [A]ll employees of the carriers now or hereafter subject to the rules and working conditions agreements between the parties hereto shall, as a condition of their continued employment subject to such agreements, become members of the organization party to this agreement representing their craft or class within sixty calendar days of the date they first perform compensated service as such employees after the effective date of this agreement, and thereafter shall maintain membership in such organization....

thorization. Affidavit of Isaiah Hillhouse ¶ 7.

This meeting between Ince and Jones failed to resolve two matters of importance. First, according to Ince, Jones told him that he still owed $176 in dues, and that if he did not pay it within a week "I would be cited," Ince Dep. at 40, rejecting Ince's alternative proposal to pay $50 per week, *id.* at 41.[4] Second, Ince had noted that throughout his employment as a signalman Amtrak continued to make deductions from his paycheck, but for dues to BMWE rather than his new bargaining agent BRS. He claims that his understanding was that "the union would take care of it," Ince Dep. at 41, and that the dues paid to BMWE would have covered

his debt to BRS, Ince Aff. ¶ 4. Amtrak, though not Local 102, affirms that this is not the case; that once a properly executed checkoff form is entered into the Amtrak computer, the deductions it authorizes continue automatically until the employee revokes the checkoff, ceases to be governed by the collective bargaining agreement, or, having switched positions and been required to join a different union, executes a checkoff form for that union. Robinson Aff. ¶ 18; Hillhouse Aff. ¶¶ 2–4. A search of Amtrak records revealed neither a revocation of Ince's BMWE checkoff nor a checkoff for BRS. Hillhouse Aff. ¶¶ 5–7.[5]

When Ince noted, two paychecks later, that Amtrak was still deducting BMWE

**4.** This Court cannot form a clear conception, from the submissions before it, of the extent of Ince's dues obligations to BRS. As the text notes, Ince claims that even after receiving the $200 check from him, Jones told him that he owed $176 in accrued dues. Exhibit 12 to Amtrak's summary judgment motion would seem to tell a different story. This unsigned, undated document (offered, incidentally, to show that "[p]rior to the Union's dismissal request, Ince was and had been aware of his Union Shop dues obligations," Amtrak Summary Judgment Motion ¶ 12), addressed to Ince by Jones, explains that "Our dues rate is $105.75 per quarter payable in advance or during January, April, July, and October," and that an application for BRS membership required "payment of a membership fee of $100.00 and dues in the amount of $176.25 from the first day of the month following the month of your employment to the end of the calendar quarter." "Total remittance due with application," the document continues, "is $276.75."

From this one can infer that when Jones told Ince he owed $176, he was referring to the figure of $176.25. But obviously, having tendered a check for $200, Ince could have owed no more than $76.25 according to Exhibit 12. If such are the circumstances, Ince's offer to pay $50 per week amounts to a request to give him an extra half week to pay up, and seems entirely reasonable. Moreover, the $176.25 figure can have been derived only as follows. Ince began work on April 4. As Exhibit 12 states, the dues obligations payable with his application begin on the first day of the month after he begins work and continue to the end of the quarter. Thus, as part of his application Ince owed dues for May and June. But this amounts only to a prorated $70.50 ($105.75 per quarter prorating to $35.25 per month), a figure easily covered, along with his membership fee, by Ince's $200 check. One gets to $176.25 only by adding dues for the third quarter. Ince's third quarter dues

were indeed due by July 31 and thus overdue when he met Jones on October 15. However, $29.50 of his $200 check should have gone to cover those dues, leaving Ince with an obligation, once again, of only $76.25. Had Ince been allowed to pay $50 a week as he suggested, he could have paid his third quarter dues before his fourth quarter dues became overdue on October 31, and have finished paying his fourth quarter dues two weeks later.

The Court notes that according to Exhibit 12 Ince's *total* BRS dues obligation, from May to December, was $282. Once he tendered his $200 check the most he could have owed BRS for the year was $82. Under these circumstances Jones's claim that he owed $176 even before his fourth quarter dues were overdue appears flatly wrong.

**5.** Both the Robinson and Hillhouse affidavits cite the BMWE collective bargaining agreement, Exhibit 7 of Amtrak's summary judgment motion, for the proposition that the employee is wholly responsible for ascertaining that his dues deduction authorizations are in order. The BMWE agreement does not, on its face, impose such a responsibility on the employee; it only absolves Amtrak of any responsibility other than transmitting the authorized amounts to the union. Indeed, the BMWE agreement imposes the affirmative responsibility on the union to provide to Amtrak "the individual authorization forms as provided for herein," Amtrak Summary Judgment Motion Exhibit 7 § 8(b). This puts the burden on BMWE, not Ince, to convey any revocation Ince might have executed to Amtrak.

The BRS collective bargaining agreement, like the BMWE agreement, would seem on its face not even to impose the requirement that employees execute checkoff forms; it only requires that Amtrak make deductions from the paychecks of those employees who do so. *Id.* Exhibit 1 § 10(a).

rather than BRS dues, he telephoned his Local 102 representative, Rudy Dombrowski, who told him that "I had been cited already, so nothing could be done, as far as the union was concerned, until I had a hearing with Amtrak." Ince Dep. at 44. Ince had indeed been cited on December 13, 1984, for failure to pay his third and fourth quarter dues. Amtrak Summary Judgment Motion, Exhibit 3. Ince expressed concern that his dues deductions were still going to BMWE rather than to BRS, and expressed the hope that some arrangement could be made short of holding a hearing. Ince Dep. at 44. Dombrowski suggested a personal meeting, but Ince declined to meet with him the day before Christmas vacation, because this would have resulted in his losing vacation pay. *Id.* at 44–45. Dombrowski told Ince that he would be notified when Amtrak scheduled a hearing in his case. *Id.* at 48.

The stage was thus set for the operative facts in this case. By certified letter dated and postmarked January 4, 1985, W.H. Robinson, Amtrak's District Manager for Labor Relations, notified Ince that BRS had informed Amtrak that he owed BRS dues and had ten days to request a hearing in writing. Amtrak Summary Judgment Motion, Exhibit 4.[6] The letter did not reach Ince's post office until Friday, January 11, 1985, Ince Dep. at 56; Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary Judgment ¶ 6, but he was unable to pick it up until January 19. *Id.; see* Amtrak Summary Judgment Mo-

tion, Exhibit 4 (photocopy of receipt signed by Ince and postmarked January 19, 1985). On Tuesday, January 22, Ince went to Amtrak's Labor Relations Office in Penn Station, New York City, to learn how he could arrange for a hearing. Ince Dep. at 57–59; Affidavit of L.F. DePhillips ("DePhillips Aff."), ¶¶ 3–6. He was informed that he could not, inasmuch as he had already been terminated on January 18. Ince Dep. at 58; DePhillips Aff. ¶ 3. A letter of termination had indeed been sent to Ince by certified mail, postmarked January 18, 1985. Amtrak Summary Judgment Motion, Exhibit 5. Ince received a copy of this letter from DePhillips. Ince was angered because he was under the impression that he had ten days from receipt of the notice of dues deficiency to request a hearing.[7] DePhillips told Ince that the union could do nothing for him, and Ince left the office in anger. Ince Dep. at 62; DePhillips Aff. ¶¶ 3, 5. It is undisputed that Ince never had any further consultations with BRS representatives about his discharge. *See, e.g.,* Ince Dep. at 65. Nor did he make independent efforts to secure a hearing from Amtrak through the procedures contemplated by the collective bargaining agreement, specifically through a request in writing, delivered by registered mail or a similarly reliable medium.

However, Ince did receive a letter dated March 5, 1985 from District Manager Robinson that stated: "In view of the circumstances surrounding your termination, and

---

6. Amtrak was required to send Ince such a letter under § 5(a) of the collective bargaining agreement. Amtrak Summary Judgment Motion, Exhibit 1, § 5(a).

7. By the plain language of the collective bargaining agreement, Ince was correct in this impression. Section 5(a) of the agreement provides that the union is to notify the carrier in writing of any alleged dues deficiencies, after which the following procedures apply:

> Upon receipt of such notice, the carrier will, within ten calendar days of such receipt, so notify the employee concerned in writing by Registered Mail, Return Receipt Requested, or by personal delivery evidenced by receipt.... An employee so notified who disputes the fact that he has failed to comply with the terms of this agreement, shall *within a period of ten calendar days from the date of receipt of such*

> *notice,* request the carrier in writing by Registered Mail, Return Receipt Requested, or by personal delivery evidenced by receipt, to accord him a hearing.

Amtrak Summary Judgment Motion, Exhibit 1, § 5(a) (emphasis supplied). Amtrak therefore had, as Ince maintains, no right to send Ince a termination notice before he even received notice that his dues were in default. The notice of dues default indeed says: "If you dispute this fact, you must request a hearing *within ten (10) days of the date of this notice.*" Amtrak Summary Judgment Memo, Exhibit 4 (emphasis supplied). This language, which is evidently boilerplate, *see* Amtrak Summary Judgment Memo, Exhibits 8a–8h, is obviously contrary to the requirements of the collective bargaining agreement.

without prejudice to the decision rendered on January 18, 1985 [that is, the decision to terminate], we will be available to meet with you on March 14, 1985 ... for the purpose of discussing this matter." Ince Aff., Exhibit D.[8] According to Ince's account of this meeting in his deposition, Ince's counsel first explained the facts surrounding the termination. Robinson "said that he would give me a reply and he gave us—what is it, a week to investigate everything and called us back and I never heard from him until that day." Ince Dep. at 71.[9] Apparently the only other topics raised were whether Ince indeed owed dues to BRS and what efforts, if any, he had made to pay them.[10]

Having gotten no results from his meeting with Robinson, Ince filed this suit on June 25, 1985.

DISCUSSION

As the foregoing account shows, the record presented to this court is replete with material issues of fact that go to the merits of this dispute. An obvious and crucial example is the question whether Ince ever submitted a checkoff card for his BRS dues. It is to be expected, then, that defendants' motions for summary judgment rest on jurisdictional and procedural grounds. Amtrak argues that its dispute with Ince is within the exclusive jurisdiction of the National Railroad Adjustment Board ("NRAB") and thus outside the subject matter jurisdiction of this court; that Ince has failed to exhaust his administrative remedies; and that in any case he has failed to state a claim against Amtrak. Local 102 similarly argues that Ince's claim of breach of the duty of fair representation would be within the exclusive jurisdiction of the NRAB if he had stated a claim, but he has not, because union shop agreements do not involve a dispute between employer and employee and thus call forth no duty to represent the employee. Local 102 argues further that there is no evidence that it breached a duty to Ince, and that even if it had this action runs afoul of the statute of limitations. Thus, defendants agree that this case arises out of Ince's breach of his union shop responsibilities and his failure to take timely steps to rectify that breach in accordance with procedures set out in the collective bargaining agreement.

■ The propriety of summary judgment in this case depends entirely on whether one accepts defendants' characterization of the issues, as set forth above, or Ince's. As will appear in the following, defendants are correct to claim that they are entitled to summary judgment on their understanding of the case. Ince, however, regards the case as one involving his wrongful discharge by Amtrak, *see* Complaint ¶ 7, before the time allowed him by the collective bargaining agreement to seek a hearing had expired. This theory of the case is perhaps obscured by the fact that Ince cites the Railway Labor Act rather than § 301 of the Labor Management Relations Act as the basis for jurisdiction over his

---

8. Ince spoke of this meeting as a "hearing" at his deposition, *see, e.g.,* Ince Dep. at 70. In his affidavit he states that he and his counsel "considered this in the nature of an appeal," in support of the conclusion that "therefore, under Section 5 of the agreement, my termination should be set aside while the appeal was pending." Ince Aff. ¶ 9. Ince is referring to § 5(b) of the agreement, which provides that a properly filed appeal "shall operate to stay action on the termination of seniority and employment, until the decision on appeal is rendered."

9. Robinson's affidavit does not deny that he never communicated further with Ince about this meeting. A promise to get back to Ince in a week with a decision is consistent with the appeal provisions of § 5(b) of the collective bar-

gaining agreement, which require the appeal to be heard within ten days of receipt of the notice of appeal and decided within ten days of the hearing.

10. This is the only topic reported in Robinson's account of the meeting: "At that meeting among other things Ince conceded he in fact had owed dues at the time of his seniority termination. According to Ince, he had offered installment payments on the portion of his outstanding dues delinquency, but that [sic] the Union had rejected his offer, and, instead, cited him." Robinson Aff. ¶ 15.

Ince reports, Ince. Dep. at 72, that the amount of dues owing was said at the meeting to be about $175. See note 4 supra for a discussion of the ambiguity of this claim.

case.[11] Nonetheless the complaint contains an allegation of wrongful discharge, and if this is a § 301 case defendants' jurisdictional arguments are misdirected, precluding summary judgment.

## I. Union Shop Disputes

Local 102 argues that its citing Ince for having failed to pay his dues was not a breach of its duty of fair representation; indeed, once Ince was delinquent, it "had the right ... if not the obligation to its other members ... to demand plaintiff's discharge." Memorandum in Support of Summary Judgment ("Local 102 Summary Judgment Memo") at 6, quoting *Getz v. Southwestern Bell Tel. Co.*, 465 F.Supp. 883, 885 (E.D.Mo.) (citation omitted), *aff'd*, 608 F.2d 301 (8th Cir.1979). Local 102 characterizes this case as grounded in a dispute over Ince's union shop obligations, and argues that it owes Ince no duty of fair representation, because it is not representing him at all; the dispute is between him and it, not between him and his employer.

This characterization of the law is logical and enjoys the endorsement of our Court of Appeals:

> Since the scope of the duty is derived from the union's status as exclusive representative of the employees to the employer ... the duty of fair representation can arise only when all three parties are involved. That is, "the duty of fair representation is co-extensive only with the power of exclusive representation." ... Given this, "[i]f a union does not serve as the exclusive agent for the members of the bargaining unit with respect to a particular matter, there is no corresponding duty of fair representation." ... Consequently, a matter that involves only the relationship between the union and its members and does not also in-

volve the employer is viewed as an internal union matter that does not give rise to a duty of fair representation.

*Price v. International Union, United Automobile Aerospace and Agricultural Implement Workers*, 795 F.2d 1128, 1134 (2d Cir.1986) (citations omitted), *vacated and remanded on other grounds*, — U.S. ——, 108 S.Ct. 2890, 101 L.Ed.2d 924 (1988). *See also, e.g., LeBoutillier v. Air Line Pilots' Association*, 603 F.Supp. 78, 79 (D.D.C.1984), *aff'd on other grounds*, 778 F.2d 883 (D.C.Cir.1985) ("Where, as here, the union member's dispute is with the union itself, the fair representation principle has no application.").

However, as this court reads Ince's complaint, there is no allegation at all that Local 102 breached a duty to him in citing him for dues delinquency. Rather, Ince's charge is that "Local 102 ... improperly and unlawfully refused to process the proprietary [sic] of plaintiff's discharge by Amtrak in accordance with the terms of the Agreement." Complaint ¶ 13. Ince's intent is clearly to state a claim against Amtrak for wrongful discharge and against Local 102 for failure to represent him against Amtrak. This opinion will shortly examine whether these claims are viable, but on the face of the complaint they are not claims about a union shop dues dispute, and so this defense of Local 102's is meritless.[12]

In similar vein, Amtrak argues that it did Ince no wrong, inasmuch as it did no more than to act as it was obliged to do under the union shop provisions of a valid collective bargaining agreement. Memorandum in Support of Defendant National Railroad Passenger Corporation's Motion for Summary Judgment ("Amtrak Summary Judgment Memo") at 14–17.

---

**11.** This theory of the case is set out explicitly in Ince's affidavit in opposition to the motions for summary judgment. Ince Aff. ¶ 8. See note 21 *infra*.

**12.** Equally meritless is Local 102's argument that Ince's complaint is untimely under the six-month limitations period that applies to breach of duty of fair representation claims, *see* Local 102 Summary Judgment Memo at 8–10. Local

102 argues that it last had any contact with Ince in December 1984, so that Ince's complaint, filed July 3, 1985, is untimely. Ince was not discharged until January 18, 1985. Thus, he had a claim for wrongful discharge at least as of that day, and *a fortiori* had a claim for breach of duty of fair representation as of that day. Thus he had until July 18 to timely file a complaint.

Amtrak is quite correct that it was obliged by the terms of the collective bargaining agreement to terminate Ince thirty calendar days after Local 102 advised it that Ince was a dues delinquent.[13] As revealed by its own statements sworn and unsworn, however, Amtrak clearly violated the notice provisions of the collective bargaining agreement. In particular, the agreement provides that "Upon receipt of such notice [from BRS that an employee is not complying with the agreement], the carrier will, *within ten calendar days of such receipt,* so notify the employee concerned in writing...." Amtrak Summary Judgment Motion Exhibit 1, § 5(a) (emphasis supplied).

Ince's citation from Local 102 for dues delinquency is dated December 13, 1984. Amtrak Summary Judgment Motion, Exhibit 3. Amtrak received the citation by December 17, 1984. Affidavit of W.H. Robinson, Jr. ¶ 11 ("Amtrak received the BRS notice no later than December 17, 1984."); Amtrak Summary Judgment Memo at 6 ("Upon receipt of the BRS citation on December 17, 1984, Amtrak handled Ince's case in the same fashion as it has handled all BRS dues delinquents."). Elementary arithmetic reveals that by the express terms of the collective bargaining agreement Amtrak was obliged to notify Ince of his citation by Local 102, and his right to request a hearing, no later than December 27, 1984. It did not. Its letter to Ince is dated and was sent January 4, 1985—eight days later than permitted by the agreement. Amtrak Summary Judgment Motion, Exhibit 4 (photocopy of letter and of certified mail receipt stamped January 4, 1985); Robinson Aff. ¶ 12 ("On January 4, 1985, Amtrak issued—by certified mail, return receipt requested—written notice to Ince."); Amtrak Summary Judgment Memo at 8 (same).

As noted, Ince first received notice that Amtrak's certified letter was at his post office on January 11, but did not pick up the letter until January 19. Amtrak's first violation of the collective bargaining agreement here led to a second. The agreement provides that Amtrak is to terminate an employee not in compliance with the agreement thirty calendar days after receiving notice from BRS "[i]n the event the employee concerned does not request a hearing as provided herein." Amtrak apparently interprets the agreement as requiring automatic termination if it does not receive a request for a hearing from the employee within thirty days of notification by BRS. *See, e.g.,* Robinson Aff. ¶ 5. Ince's situation shows that that interpretation is wrong. For the agreement, as noted above, provides the employee an opportunity to request a hearing "within a period of ten calendar days from the date of receipt of such notice [from Amtrak that the employee has been cited by BRS]."[14] Having received the notice on January 19, Ince had until January 29 to "request a hearing as provided herein"; Amtrak could not have known whether he would or would not do so until then, and so could not apply the thirty-day provision. Indeed, Amtrak's application of the thirty-day provision produced the startlingly anomalous result that so angered Ince—that he was terminated before he was even informed of his right to a pretermination hearing.[15]

13. "In the event the employee concerned does not request a hearing as provided herein, the carrier shall proceed to terminate his seniority and employment under the Rules and Working Conditions Agreement not later than thirty calendar days from receipt of the above described notice from the organization...." Amtrak Summary Judgement Motion, Exhibit 1, § 5(a).

14. The court observes once again that Amtrak's boilerplate notice to employees that they have been cited by BRS tells them that they have ten days from the date of the *notice* to request a hearing, and thus does not conform to the collective bargaining agreement.

15. The collective bargaining agreement lays out two timetables that neatly dovetail into a single scheme. On the one hand, the employer is required to terminate a noncomplying employee thirty days after citation by BRS. On the other, Amtrak is required to notify the employee within ten days of receiving a citation from BRS; the employee then has ten days to request a hearing; the hearing, if requested, is to be held within ten days of the date of receipt of the request. This second timetable clearly envisions a maximum of thirty days from citation to hearing, if any. Amtrak's violation of its obligation to send Ince timely notice of his citation threw the scheme awry.

The fact that Ince did not pick up the letter for eight days after he had notice of its arrival is irrelevant. For even if Ince had picked up the letter on January 11 (equivalently, if we regard notice of the letter as notice of its contents), he would have had until January 21 to request a hearing, and Amtrak still could not have terminated him on January 18.

█ In sum, this court finds that Ince has clearly stated a claim for violation by Amtrak of the collective bargaining agreement, in that Amtrak discharged Ince before his time to request a hearing on his union shop violation had expired—indeed, before he was even notified that he would be terminated if he did not request a hearing. It remains only to consider whether this court has jurisdiction over Ince's claims.

## II. *Lack of Subject Matter Jurisdiction*

█ Amtrak argues that for parties subject to the Railway Labor Act,[16] claims of wrongful discharge are "minor disputes" subject to the exclusive jurisdiction of the NRAB. 45 U.S.C. § 153 First (i) (1982); *Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 322, 92 S.Ct. 1562, 1564, 32 L.Ed.2d 95 (1972). Indeed, *Andrews* specifically so holds, overruling prior Supreme Court cases that held Railway Labor Act remedies to be optional and therefore permitted railroad employees to bring state court breach of contract claims for discharges.[17]

█ However this is not just a suit alleging wrongful discharge. Ince also claims that Local 102 breached its duty of fair representation to him. This fact raises a jurisdictional thicket entered by the Eighth Circuit in *Raus v. Brotherhood Railway Carmen*, 663 F.2d 791 (8th Cir.1981). Here, the Eighth Circuit began by noting that claims of breach of duty of fair representation are not within the jurisdiction of the NRAB, 663 F.2d at 794 (citing *Czosek v. O'Mara*, 397 U.S. 25, 27–28, 90 S.Ct. 770, 772–773, 25 L.Ed.2d 21 (1970)), and that they can normally be brought in federal court under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(b) (1982).[18] This normal proposition does not hold, however, for persons subject to the Railway Labor Act, for 29 U.S.C. § 152(2) and (3) specifically exempt such persons from the LMRA.[19] Nonetheless, the Eighth Circuit found that 28 U.S.C. § 1337 (1982)[20] provided a basis for jurisdiction: "Federal court jurisdiction over such a suit is clearly granted under 28 U.S.C. § 1337 since it is one 'arising under a law regulating commerce of which the federal courts are given jurisdiction....'" 663 F.2d at 796 (quoting *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen*, 323 U.S. 210, 213, 65 S.Ct. 235, 237, 89 L.Ed. 187 (1944) (citations omitted)) (footnote omitted).[21]

**16.** As either a maintenance-of-way engineer or a railroad signalman, Ince falls under the jurisdiction of the third division of the NRAB established by 45 U.S.C. § 153 First (h) (1982).

**17.** *Moore v. Illinois Central R. Co.*, 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089 (1941).

**18.** 29 U.S.C. § 185(b) provides, in pertinent part: "Any ... labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States."

**19.** 29 U.S.C. § 152 provides, in pertinent part: "(2) The term 'employer' ... shall not include ... any person subject to the Railway Labor Act...." "(3) The term 'employee' ... shall not include ... any individual employed by an employer subject to the Railway Labor Act...."

**20.** 28 U.S.C. § 1337 provides: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." The duty of fair representation is implied from the Railway Labor Act. 663 F.2d at 795 (citing *Steele v. Louisville & Nashville R.R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944)).

**21.** The *Raus* court noted here that "[t]he general rule is that where a basis for federal court jurisdiction appears clearly from an examination of the face of the complaint, the court may sustain the suit even if the plaintiff has not relied on that basis." 663 F.2d at 796. Just as the plaintiffs in *Raus* mistakenly relied on the LMRA, 29 U.S.C. § 185, as a basis of jurisdiction, here Ince relies on the entire Railway Labor Act and 28 U.S.C. § 1331, the general federal question jurisdiction statute. Even though, as the *Raus* court's analysis shows, this allegation is mistaken, Ince clearly states a

The question the *Raus* court faced was then whether the appellants' claim against the railroad could be joined in federal court with the breach of fair representation claim, over which the court clearly had jurisdiction. Building on the Supreme Court's holding in *Glover v. St. Louis–San Francisco Railway*, 393 U.S. 324, 329, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969) that the federal courts can assert jurisdiction over a railroad when "the 'dispute' is one between some employees on the one hand and the union and management together on the other," the *Raus* court held that

> where there are good faith allegations and facts supporting those allegations indicating collusion or otherwise tying the railroad and the union together in allegedly arbitrary, discriminatory or bad faith conduct amounting to a breach of the duty of fair representation, the district court has jurisdiction over the union on the fair representation claim and over the railroad on the contract violation claim.

663 F.2d at 798.

Here, Ince alleges that "since the date of discharge of the plaintiff by Amtrak in violation of the Agreement, the defendants have joined in a conspiracy to deprive plaintiff of his rights and employment under the terms of the Agreement." Complaint ¶ 16. Defendants respond that in his deposition Ince admitted that he was unaware of any meetings, correspondence, or discussions between union representatives and Amtrak officials regarding his case or his dues situation. *See* Ince Dep. at 80–81.[22]

Although the *Raus* rationale is widely accepted, it is regularly held that mere conclusory allegations of collusion or conspiracy are inadequate to sustain federal court jurisdiction over a railroad in breach of fair representation cases. *See, e.g., Hunt v. Missouri Pacific Railroad*, 729 F.2d 578, 580 (8th Cir.1984); *Raus*, 663 F.2d at 798–99; *Baxter v. Railway Express*

*Agency, Inc.*, 455 F.2d 693, 697 (6th Cir.) (defendants' affidavits completely negated allegations of conspiracy), *cert. denied*, 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972). In his Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Ince Reply Memo"), docketed after this court's discovery cutoff date, Ince cites alleged action and inaction by Amtrak and Local 102 dating from *before* the discharge, not after as the complaint alleges.

The facts as set out earlier in this opinion are at best neutral on the question of collusion. In brief review, those facts include: Ince's repeated efforts to get in touch with Gerald Jones to complete the application forms necessary for him to join Local 102, culminating in his tendering a check for $200 on October 15, 1984; Ince's completion of a checkoff form that same day, which, however, Amtrak claims to be unable to trace; Jones's intransigence in refusing to accept Ince's proposal to pay the balance of his dues in installments; the fact that Ince was still having BMWE dues deducted from his paycheck, even though he had been told that "the union" would take care of it; BRS's refusal to help Ince when he realized that the BMWE dues deduction problem had not been resolved, because he had already been cited by BRS; Ince's attempt to arrange a meeting with Dombrowski of BRS, to obviate a hearing, and Dombrowski's informing him that he would be notified when Amtrak scheduled a hearing; Amtrak's laches in notifying Ince of his citation by BRS and his right to a hearing; Ince's consequent failure to receive notice that he should schedule a hearing until after he had been terminated; Amtrak's claim that it could not do anything because he had already been terminated; and the meeting with District Manager Robinson that was never followed up.

■ Thus, there is no evidence of an overt agreement to deprive Ince of his rights as an Amtrak employee. Although

claim for breach of duty of fair representation, and so, like the *Raus* court, this court finds jurisdiction under § 1337.

**22.** At that point, October 24, 1985, however, discovery was not complete. *See* Pretrial Order,

January 24, 1986 (ordering defendants "to furnish documents previously requested by plaintiff ... by 2/3/86" and setting February 14, 1986 as cutoff date for discovery).

the evidence is not inconsistent with collusion between Amtrak and Local 102, it is equally consistent with a pattern of independent ingrained incompetence and bureaucratic intransigence. Nonetheless, this court finds that Amtrak's and Local 102's actions and inactions are sufficiently tied together to make Ince's suit essentially one between "some employees on the one hand and the union and management together on the other." The evidence is that Ince was not only aware of his union shop obligations, he diligently tried to discharge them. The only incidents in this record that can be charged against Ince are his unwillingness or inability to tender the full amount of his accrued dues when asked to by Mr. Jones, and his refusal to meet with Mr. Dombrowski for fear of losing holiday pay. Taken as a whole, Ince's submissions set forth a pattern of conduct by Amtrak and Local 102—Local 102's delay, not attributable to Ince, in providing and processing his union application materials; the unexplained disposition of Ince's BRS checkoff card; the continued deduction of BMWE dues instead of BRS dues from Ince's paycheck, a matter the collective bargaining agreement does not, contrary to defendants' claims, put the burden on Ince to rectify, and one which, according to Ince, the union represented it would take care of; Jones's and Dombrowski's failure to accommodate Ince, actions which on this record led to his citation; Amtrak's failure to notify Ince of his citation within the time specified by the collective bargaining agreement, leading to his discharge before the time to ask for a hearing allotted him by that agreement had even expired; Amtrak's representative at Penn Station refusing to talk to Ince when he took steps to initiate a request for a hearing, reasonably leading Ince to think that Amtrak would not grant a hearing; Amtrak's subsequent meeting with Ince, which it refuses to characterize as either an appeal or a hearing under the collective bargaining agreement, and its failure to follow up thereon—in which the intertwined actions of Amtrak and Local 102 led to Ince's wrongful discharge.

As noted, Ince claims that he did execute a checkoff card for Local 102. The collective bargaining agreement between BRS and Amtrak provides that dues deductions "shall not be effective with respect to any individual employee until he shall have furnished the carrier with a written assignment to the organization of such membership dues, initiation fees, and assessments...." Amtrak Summary Judgment Motion Exhibit 1 § 10(a). This language does put the burden of furnishing the card on Ince, but Ince reports that he was told that "the union would take care of it," Ince Dep. at 41, and that when he worried because BMWE dues were still being deducted from his paycheck, his foreman told him "don't worry about it. There is probably some paperwork that has to be taken care of and they will probably get it corrected the next time." Ince Dep. at 43. On this record, then, Ince reasonably relied on the union to transmit his checkoff card to Amtrak. Had it done so, there would have been no dues delinquency. Because it did not, the wheels of bureaucracy began to grind fine: once Local 102 cited Ince, Amtrak automatically terminated him thirty days later, in spite of the fact that through its own violation of the collective bargaining agreement it deprived Ince of the time that agreement allowed him to seek a hearing—at which, no doubt, this whole matter could have been resolved. Ince's predicament would never have arisen had it not been for a combination of wrongs committed by Amtrak and Local 102. Thus, even though the evidence for collusion between these entities is slight at best, Ince's suit is, like *Glover*, one between the employee on the one hand and the union and the employer together. It is not one "between an employee or group of employees and a carrier or carriers," over which the NRAB has exclusive jurisdiction, *see* 45 U.S.C. § 153 First (i) (1982). Thus, the court concludes that it has jurisdiction over Amtrak.

### III. *Failure to Exhaust*

In view of the foregoing, Amtrak's and Local 102's argument that Ince's complaint is subject to dismissal for his failure to exhaust contractual and other remedies can

be quickly disposed of. "Hybrid" suits against a union for breach of duty of fair representation and an employer for violation of the collective bargaining agreement are exceptions to the exhaustion requirement. This has been the law of the land since *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 914–915, 17 L.Ed.2d 842 (1967), and of the Second Circuit since *Schum v. South Buffalo Railway Co.*, 496 F.2d 328 (2d Cir.1974).

## IV. *Breach of Duty of Fair Representation Claim*

Thus, the only serious issue in this case is whether Ince has indeed stated a claim against Local 102 for breach of its duty of fair representation, for if he has, this court has jurisdiction over that claim and, without exhaustion, his claim against Amtrak, and, in view of the clear presence of disputed issues of fact, the defendants' motions for summary judgment must be denied.

The gravamen of Ince's breach of duty of fair representation claim is somewhat unclear. The complaint has it that Ince advised Local 102 of his discharge, claimed it violated the collective bargaining agreement, asked Local 102 to "process the proprietary of his discharge," Complaint ¶ 12, but received no satisfaction because the union "improperly and unlawfully" refused to do so, *id.* ¶ 12. Unfortunately for Ince, there is no evidence in the record that he did any of these things.[23]

Local 102's entire defense[24] against Ince's charge is that he never asked it for help after his discharge. The question is thus whether any actions taken by Local 102 representatives before Ince's discharge could constitute a breach of the duty of fair representation. In *Vaca v. Sipes* the Supreme Court held that such a breach occurs "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." 386 U.S. 171, 190, 87 S.Ct. 903, 916–917, 17 L.Ed.2d 842 (1967). Mere negligence cannot be the basis for a fair representation claim. *E.g., Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891 (4th Cir. 1980). There appears to be a division among the circuits, however, about whether union conduct must be intentional to constitute a breach of the duty. *Compare Graf v. Elgin, Joliet & Eastern Railway*, 697 F.2d 771, 778 (7th Cir.1983) (Posner, J.) (apparently requiring intentional union misconduct[25]) *with Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1273 (9th Cir. 1983) (reviewing authorities and holding that "the union should be responsible for a total failure to act that is unexplained and unexcused"); *Ruzicka v. General Motors Corp.*, 523 F.2d 306, 310 (6th Cir.1975) (inexplicable neglect in processing of grievance rose to level of arbitrariness and perfunctoriness condemned in *Vaca v. Sipes*). The Second Circuit does not appear to have addressed this issue.

Reviewing Ince's account of his December 1984 conversation with Dombrowski,

**23.** Contrary to defendants' contentions, it is false that there is no evidence that Ince did not contact Local 102 representatives at all after the December 1984 conversation in which Dombrowski informed him that he had been cited for dues delinquency and nothing could be done. Evidently concerned about what might happen, he had an inconclusive conversation with his foreman after Christmas. Ince Dep. at 50–52. It is true, however, that he did not speak to union representatives after his discharge. *Id.* 55, 65, 76. His justification seems scarcely unreasonable under the circumstances. Ince maintained that he did not approach union representatives because Dombrowski had told him the union could do nothing. *Id.* at 65. Ince reports Dombrowski as telling him to await a hearing because "I had been cited already, so nothing could be done, as far as the union was

concerned, until I had a hearing with Amtrak." *Id.* at 44. Amtrak, however, of course took the position that there could be no hearing because Ince had already been terminated. It would seem to follow, though it does not, that according to Dombrowski the union could therefore do nothing, period.

**24.** Apart, that is, from its mischaracterization of Ince's claim as one for failure to represent him with respect to his breach of his union shop obligations. *See* Section I *supra*.

**25.** Judge Posner does note that "extreme recklessness is so close to intentional wrongdoing that the law treats it as the same thing," *Graf*, 697 F.2d at 778, but this issue did not arise on the facts in *Graf*.

this court finds illuminating parallels with *Kozina v. Baltimore & Ohio Chicago Terminal Railroad Co.*, 609 F.Supp. 53 (N.D. Ill.1984), which Amtrak cites in a different connection. In *Kozina*, the plaintiff claimed that his case fell within one of the futility exceptions to the requirement of exhaustion of NRAB remedies because his union representative told him that the union could do nothing for him. The court disagreed:

> In this case, the plaintiff's union "grievor" stated that "there was nothing the United Transportation Union would be able to do in his behalf in this matter." The plaintiff does not allege that he asked the "grievor" to file a grievance or that the "grievor" refused to begin that process. It does not constitute intentional misconduct for a union "grievor" to believe that a grievance may have little merit or hope for success.... Moreover, a union is not required to prosecute a grievance that it honestly believes lacks merit.... Plaintiff presents no allegations that the "grievor" was acting in bad faith. Therefore, in this case, plaintiff had not yet requested the union to file a grievance and none of the facts allege behavior which constitutes intentional misconduct by the union.

*Kozina*, 609 F.Supp. at 55. Defendants assuredly would have this court see Ince's case as parallel to Kozina's: Ince merely had a conversation with Dombrowski in which the latter, in good faith, told him the union could do nothing, in response to which Ince failed to take actions that could have prevented his discharge (paying his dues or arranging for a hearing), and compounded his self-inflicted ills by seeking relief in this court rather than through the grievance mechanism set up by the collective bargaining agreement.

■ To this Court, the differences with *Kozina* are far more striking than the parallels. The main parallel is that Ince, like Kozina, did not ask his union representative to initiate the grievance procedure.

How could he? He had not been terminated, and thus had nothing to file a grievance about. His conversation with Dombrowski was about how he could get his dues deduction situation in order, so that Amtrak would stop deducting his BMWE dues and start deducting his BRS dues. Ince Dep. at 43. It was in reference to this topic that Dombrowski told him that "I had been cited already, so nothing could be done, as far as the union was concerned, until I had a hearing with Amtrak." *Id.* at 44. This was not a refusal to process a grievance. It was not even a refusal to represent Ince in the dues deduction matter.[26] Rather, it was an attempt to explain to Ince that the next stage in the process would have to be a hearing. And, crucially, it was a *commitment to represent Ince at that hearing* as the collective bargaining agreement required. This fact emerged in Ince's subsequent account:

> The way he explained to me is that, I would not—I would not get dismissed until I had a meeting with Amtrak *and the union* and at the meeting, they would decide at that particular time whether or not I would be discharged or not or whether the matter could be cleared up.

> .     .     .     .     .

> He told me I am not discharged. You will receive a letter to go to a hearing and at that time, they will give me a date for a hearing and I just appear and *they will take care of it at that time.* Because it is now, you know, it is not like I did anything wrong when I was talking to him because I had been paying the union and *they will take care of it,* so I said, okay.

Ince Dep. at 47–48 (emphasis supplied). Thus, after the conversation with Dombrowski Ince would have been justified in the impression that the union was committed to meeting its statutory duty to represent him fairly, here by meeting its con-

---

**26.** Such a refusal would have violated the express terms of the collective bargaining agreement, for as Dombrowski noted the next stage would have been a hearing, and the agreement specifically says that "A representative of the organization shall attend and participate in the hearing." Amtrak Summary Judgment Motion Exhibit 1, ¶ 5(a).

tractual duty to represent him at the hearing.[27]

Of course, things turned out otherwise. A principal reason they turned out otherwise, as noted, was that Amtrak violated its contractual duty to send Ince notice of his citation by Local 102 within ten days of its own receipt of that notice. The collective bargaining agreement requires that Amtrak copy the union on all such notices to employees. Amtrak Summary Judgment Motion, Exhibit 1, ¶ 5(a) ("Copy of such notice to the employee shall be given the organization.").[28] If a union representative did indeed receive a copy of the notice, he can scarcely have done so earlier than January 4, 1985, the date on which it was written and mailed to Ince. Upon doing so, he would have realized that Ince would have had until at least January 14 to request a hearing, but that January 13 would have been the thirtieth day since Ince's citation. Thus, if Amtrak misinterpreted the collective bargaining agreement, it would have terminated Ince on January 13, while he still had one day to request a hearing. Ince would have been prejudiced in a matter in which the union had a statutory and contractual duty to represent him. It was the union's duty to guard Ince against such prejudice. It could most simply have done so by extending the time for Ince to file his hearing request, by agreement with Amtrak. *See* Amtrak Summary Judgment Motion, Exhibit 1, ¶ 5(d) ("The time periods specified in this section may be extended in individual cases by written agreement between the carrier and the organization."). It did not. Gaining such an extension is precisely the sort of ministerial act whose negligent omission, in the view of the *Dutrisac* court, gives rise to a claim for breach of the duty of fair representation. *Dutrisac*, 749 F.2d at 1273–74.

This Court agrees, and consequently holds that Ince has stated such a claim.

This Court therefore has jurisdiction over the union on Ince's second cause of action. For the reasons discussed above, the Court also has jurisdiction over the railroad on Ince's first cause of action. Defendants' motions for summary judgment are, therefore, denied in their entirety.

The next pretrial conference in this case shall take place on October 14, 1988, at the United States Courthouse, Foley Square, New York, New York, at 10:00 A.M., unless this court receives a written stipulation of discontinuance signed by all counsel before that date.

27. *Cf. Schum*, 496 F.2d at 331 ("Reassured on several occasions by union officials that his grievance would be processed administratively, Schum understandably left the matter in the hands of the union.... Under these circumstances, Schum cannot be denied his day in court....").

28. Amtrak's letter to Ince, Amtrak Summary Judgment Motion Exhibit 4, does carry the notation that it is to be copied to one "J.K. York," but there is no indication in this record whether this person is the BRS representative who is supposed to receive such correspondence under the agreement.